UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MICHELLE VAN BUREN, Personal Representative
for the ESTATE OF WILLIAM REDDIE, deceased
and WILLIAM REDDIE,

                  Plaintiff,                      Case No. 13-cv-14565

v.                                        Honorable Thomas L. Ludington

CRAWFORD COUNTY, CITY OF GRAYLING,
JOHN KLEPADLO, and ALAN SOMERO,
in their individual and official capacities,

                  Defendants.

_____/

**ORDER SCHEDULING EVIDENTIARY HEARING AND DIRECTING
SUPPLEMENTAL BRIEFING**

Three dispositive motions and two motions to strike are currently pending before the Court in this case. Plaintiff Michelle Van Buren, as next friend for decedent William Reddie, has filed a motion for summary judgment and a motion for sanctions, seeking a declaratory judgment. She has also filed a motion to strike Defendants' proposed expert, Wesley Smith. Defendants Crawford County, City of Grayling ("Municipalities"), Deputy John Klepadlo, and Officer Alan Somero ("Officers") have filed a joint motion for summary judgment and motion to bar the expert report and testimony of Plaintiff's expert.

**I.**

Plaintiff Van Buren is the next friend of the deceased William Reddie, a resident of the City of Grayling. Defendant City of Grayling is a Michigan municipality located in the County of Crawford. Defendant Officer Alan Somero was, at the time of the Reddie's death, a police

officer for the City of Grayling Police Department. Defendant Deputy John Klepadlo was, at the time of Reddie's death, a deputy sheriff for the Crawford County Sheriff's Department.

### A.

On February 3, 2012 at about 2:00 p.m., Defendant Somero responded to reports of a possible domestic violence incident at Reddie's home. Reddie lived in an apartment complex in Grayling. Defendant Klepadlo was on duty for the Crawford County Sheriff's Department and responded to the call with Defendant Somero. The two have a history of responding to calls together. The Officers responded to reports of Reddie allegedly yelling at a woman in his apartment. Reddie's neighbors believed he was in a confrontation with his girlfriend.

Upon arriving at Reddie's apartment, the Officers learned from Reddie that he was speaking with his girlfriend over the phone. Reddie did admit that the conversation became heated at points, but that he was home with his young son.

During the visit, the Officers searched Reddie's apartment. They noticed the smell of burnt marijuana. After some questioning, Reddie told the Officers that he had smoked marijuana that morning around 10:00 a.m. Reddie then produced a piece of marijuana paraphernalia. Defendant Somero told Reddie that he would refer Reddie to Child Protective Services because he was using marijuana in his home in front of his minor child.

Defendant Somero did indeed report Reddie to CPS. CPS worker Craig Sharp and foster care worker Stacy Sage took the report from Somero.

### B.

Following Defendant Somero's report, Mr. Sharp and Ms. Sage visited Mr. Reddie at his apartment. Reddie was expecting Mr. Sharp and Ms. Sage when they arrived. He admitted to smoking marijuana earlier that morning and informed them that he would not consent to the

- 2 -

removal of his son. Reddie also allegedly stated that Defendant Somero would "get what is coming to him" because of the false allegations Defendant Somero made to CPS.

Mr. Sharp sought to schedule a follow-up meeting with Reddie but Reddie informed him that he was leaving town and would not be around. Mr. Sharp became worried that Reddie would leave with his son. As a result, he initiated a petition with the Crawford County Circuit Court for the removal of Reddie's son. The Circuit Court issued an order authorizing removal that same day. Once the court issued the order, Mr. Sharp contacted the Officers and the four individuals involved in the case (including Ms. Sage) went to Reddie's apartment.

### C.

When the Officers and the two CPS workers arrived at Reddie's apartment, Reddie was loading his truck with personal items.[1] When Reddie saw the four individuals he stated "you're not taking my kid." Sage Dep. 79–82, Ex. 3, Defs.' Mot. Summ. J., ECF No. 55-4. Reddie then proceeded up the stairs to his apartment, picked up his son, and went inside the apartment. The Officers and CPS workers followed Reddie into his apartment. The individuals entered at Reddie's invitation.

Once inside the apartment, the situation intensified quickly. Reddie once again told the Officers and CPS workers that they were not going to take his son. At this time Reddie was separated from the four individuals by a coffee table. The closest individuals to Reddie were the Officers, who were about five to ten feet away from him. According to the Officers, Reddie was playing very loud music and moving as though he was "hyping himself up for a fight." Klepadlo Dep. 71, Def.'s Mot. Summ. J., Ex. 5, ECF No. 55-6. Right about this time, Defendant Klepadlo drew his Taser and pointed it at Reddie. Also around this early period in the apartment, the

---

[1] All of the facts in this section (and many of the earlier facts) come solely from the testimony of the Officers and the CPS workers. The only other witness to these events was Reddie, who is deceased. Thus, the facts as presented necessarily present Defendants' points of view.

Officers and CPS workers were able to get Reddie's son out from behind the coffee table (he was standing next to Reddie) and out of the apartment.

Very shortly after Defendant Klepadlo drew his Taser, Mr. Sharp shouted that Reddie had a knife. At this point, Defendant Klepadlo holstered his Taser and drew his handgun. Defendant Somero had his Taser drawn during this exchange but did not transition to his handgun. According to the Officers, Reddie would not comply with their directions to drop the knife. By now, Reddie had come out from behind the coffee table and was five to ten feet away from the Officers. Reddie was further instructed that noncompliance would result in the Officers deploying their weapons.

According to the Officers, Reddie became "extremely irate." Ex. 5 at 96. Reddie then raised his hands to shoulder height and in the direction of the officers. At the same time Reddie moved forward (described by the Officers as a "lunge"). Defendant Klepadlo fired a single shot at Reddie. The bullet struck Reddie, who died instantly.

During a search of the scene, officers located a closed knife six feet from where Reddie's body came to rest. The knife appears in photographs furnished by the parties to be a folding knife approximately three inches in length that can be worn on a belt and opened with one hand. The parties do not provide a detailed description of the knife.

**D.**

On November 1, 2013, Van Buren—as the personal representative of Reddie's estate—filed a complaint against Crawford County, the City of Grayling, and Officers Klepadlo and Somero. Pl.'s Compl., ECF No. 1. The complaint includes claims for excessive force under 42 U.S.C. § 1983 (Count I), failure to train and supervise as to Crawford County (Count II), failure to train and supervise as to the City of Grayling (Count III), assault and battery (Count IV), and

- 4 -

gross negligence (Count V). On January 31, 2014, Van Buren filed an amended complaint, adding Mr. Sharp and Ms. Sage as Defendants as well as claims for warrantless entry (Count VI), violation of due process (Count VII), conspiracy under § 1983 (Count VIII), and abuse of process (Count IX). *See* Pl.'s Am. Compl.

On March 12, 2014, Sharp and Sage filed a motion to dismiss all of Van Buren's claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6). That motion was granted on May 29, 2014.

During discovery, a dispute arose concerning whether video or audio recordings existed of the incident. Plaintiff learned that both Officers' police vehicles contained recording equipment, but Defendants did not produce any audio or video files. The only production made by Defendants was a compact disc with an unreadable file. Plaintiff filed a motion to compel on March 11, 2015 seeking additional information related to the recording capabilities of the Officers' police vehicles.

On April 15, 2015, the Court issued an order authorizing Plaintiff to enter onto the premises of Defendant City of Grayling with an expert to inspect the City's computer systems for potential traces of any video or audio recording. ECF No. 51. Amongst other procedural parameters, the April 15 Order instructed that:

- Plaintiff is limited to inspecting only one City of Grayling computer. Defendant City of Grayling must ensure that the computer provided has access to all relevant downloads and activity by Officer Somero or any other officer that would have reasonably had access to the video equipment in Officer Somero's cruiser, during the day in question and the following forty-five day period.

The April 15 Order also directed Defendant County of Crawford to produce any video or audio recording it may have from Deputy Klepadlo's recording system, if such a recording existed. *Id.*

Plaintiff conducted the site visit and her expert issued a report that concluded that both Municipalities had the ability to record the incident involving Reddie. He further concluded that, based on his inspection of the City of Grayling's computer, there should be a recording of the incident and not simply a corrupt file on a compact disc.

## II.

Plaintiff and Defendants filed motions for summary judgment. Plaintiff seeks summary judgment only as to the Officers. Defendants seek summary judgment on all of Plaintiff's claims, including those brought against the Municipalities.

## A.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).

The Court must draw all reasonable inferences in favor of the non-movant when reviewing the evidence and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

**B.**

The framework for analyzing claims of excessive force when challenged by a motion claiming qualified immunity comes from the Supreme Court's decision in *Saucier v. Katz*, 533 U.S. 194 (2001). A court confronted with a claim of qualified immunity must answer two questions: (1) "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?," *Saucier*, 533 U.S. at 201, and (2) "[W]as the right 'clearly established' to the extent that a reasonable person in the officer's position would know that the conduct complained of was unlawful," *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011) (quoting *Saucier*, 533 U.S. at 201). These inquiries do not need to be taken in order. *Id.*

**1.**

In answering the first question the court must draw all reasonable inferences in favor of the party asserting the injury. *See Howser v. Anderson*, 150 F. App'x 533, 537 (6th Cir. 2005). The inquiry into the reasonableness of an officer's actions is a delicate one. It requires analyzing the situation confronting the officer as the situation was known to him as it was unfolding, not using "the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

"[D]eadly force is only appropriate in rare circumstances." *Howser*, 150 F. App'x at 538. "The Supreme Court has held that the use of deadly force is only constitutionally reasonable if 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Id.* at 537 (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). When analyzing the reasonableness of the use of deadly force, a court must look at three different factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006) (quoting *Darrah v. City of Oak Park*, 255 F.3d 301, 307 (6th Cir. 2001)) (internal quotation marks omitted).

The evidence in the record supports three definitive conclusions about what transpired in William Reddie's apartment the day he was killed. Both officers and both CPS workers have testified that Mr. Sharp exclaimed that Reddie pulled a knife. Additionally, investigators discovered a knife in the vicinity of Reddie's body. Lastly, Dr. Philip Croft, the forensic pathologist that performed Reddie's autopsy, concluded that the bullet that killed Reddie entered his body at a downward trajectory, consistent with Reddie leaning or lunging forward.

It is against this background that Plaintiff argues that Deputy Klepadlo and Officer Somero are not entitled to qualified immunity.

Plaintiff emphasizes that the knife was found at some distance from Reddie's body: almost six feet away, and concludes from this fact that Reddie was not armed during the crucial moments of the incident—having dropped the knife when directed to. But this conclusion is speculative, based on nothing more than the fact that the knife was not found on or more closely adjacent Reddie's body. The fact that the knife was found away from Reddie's body does not

preclude the possibility that Reddie dropped the knife at the moment he was shot or very shortly thereafter.

Plaintiff also emphasizes that the knife was found closed, suggesting that it is unlikely that it was ever actually open. The parties do not describe the knife and furnished only a low resolution picture of the knife. The knife appears capable of being opened with one hand but also appears to have a locking mechanism that would prevent speedy closure. Even taking the evidence in the light most favorable to Defendants, it is unlikely that the knife was ever open.

But, even assuming both of Plaintiff's conclusions about the knife in Reddie's apartment—that Reddie did not possess it and that it was always closed—are true, they do not affect the result in this case. Reddie's actual possession of the knife is not relevant, based on the facts as they existed in Reddie's apartment, to determining whether Deputy Klepadlo used a constitutionally reasonable amount of force. That is because a reasonable officer in Deputy Klepadlo's position would believe that Reddie had a knife because Mr. Sharp shouted that he did and he would have had no ability to verify that fact before being faced with a rapidly developing situation.

The only time that Deputy Klepadlo could have become aware that Reddie did not have a knife is when Reddie lunged at him and Reddie's hands came forward toward Deputy Klepadlo. Klepadlo Dep. 103, 118–120, Ex. 5, Defs.' Mot. Summ. J., ECF No. 55-6. Prior to that, Reddie had his right hand hidden behind his back, making it impossible to determine whether he was actually wielding the knife that Mr. Sharp indicated was present. The only information Deputy Klepadlo had to work with was Mr. Sharp's exclamation that Reddie had a knife. It would be unreasonable to expect a law enforcement officer to make a determination as to whether an

individual is armed as the individual is lunging toward the officer, when the only other evidence the law enforcement officer had was that the individual was indeed armed.

Plaintiff attempts to answer this concern with but more speculation. She suggests that Reddie tripped, or was, for some reason, not actually lunging at Klepadlo. Maybe, she offers, Reddie was even trying to comply with orders. Yet nothing in the evidence supports any of these conclusions.

The closest Plaintiff comes to substantiating the claim that Reddie was not lunging at Deputy Klepadlo is through the testimony of Dr. Philip Croft, a forensic pathologist who performed Reddie's autopsy. Dr. Croft testified that the path the bullet took through Reddie is "consistent with the bullet coming [from a] trajectory downward, and if anything, from right to left." Croft Dep. 28, Pl.'s Mot. Summ. J., Ex. H, ECF No. 58-8. When analyzing an abrasion on the back of one of Reddie's arms, Dr. Croft testified that it was not consistent with a typical carpet burn. It was most likely caused by "a fixture on the wall [behind Reddie], a socket, a light switch, something on the ground." *Id.* at 84. This led Dr. Croft to suggest that Reddie had fallen against a light switch on the wall behind him since Dr. Croft "was told at the time there was some concern that he slid down the wall." *Id.*

Dr. Croft further suggested that Reddie was likely in the area of the light switch when he was shot. This suggestion was based primarily on the fact that the impact from a bullet "doesn't propel people through space . . . like you see on television." *Id.* at 85. Additionally, Dr. Croft stated that Reddie's spinal cord was damaged by the bullet. Dr. Croft concluded, as a result, that Reddie "had at least weakness, if not paralysis, in one or possibly both legs." Id. at 137. If Reddie's spinal cord damage led to the complete paralysis of his legs and Reddie was, at the time

he was shot, "leaning forward, such as the center of gravity is forward . . . I would suspect that you would either fall down or forward, rather than back." *Id*. at 87.

Thus, Dr. Croft reaches two conclusions. First, the bullet that killed Reddie came from a downward trajectory consistent with Reddie lunging forward. Second, the bullet that killed Reddie damaged Reddie's spine. That damage would have led to at least some impairment in Reddie's ability to move one of his legs. It may have even been significant enough to cause full paralysis in both of Reddie's legs. If Reddie suffered from full paralysis he would have dropped immediately upon his spine being struck and would not have travelled backwards.

Plaintiff emphasizes Dr. Croft's statement that Reddie's legs may have been paralyzed by the gunshot wound to his spine. Dr. Croft, however, did not conclude that Reddie suffered paralysis just that it was possible, and, if paralysis occurred, Reddie would have immediately collapsed. Individuals present at the scene of the shooting testified that after Reddie was shot he stumbled backward before falling down. This is consistent with Dr. Croft's suggestion that Reddie's spine was damaged but not with his conclusion that it was damaged to the point of paralysis.

### i.

These facts alone are sufficient to deny Plaintiff's motion for summary judgment against Deputy Klepadlo and Officer Somero. Viewing the facts in a light most favorable to the non-movant, Plaintiff cannot establish that Deputy Klepadlo used a constitutionally unreasonable amount of force. The facts, viewed in such a light, reflect Reddie lunging at Deputy Klepadlo, who believed Reddie was armed with a knife. The facts further reflect Reddie closing the distance between him and the officers to roughly five feet when Deputy Klepadlo fires a single shot. The bullet struck Reddie in the spine. Reddie then stumbled backwards and collapsed. On

these facts, Plaintiff is not entitled to summary judgment against Deputy Klepadlo. A reasonable officer does not violate the Constitution by firing a single shot at a lunging individual that the officer believes to be armed, particularly when the individual has quickly moved from ten feet away to within five feet.

Similarly, Plaintiff is not entitled to summary judgment against Officer Somero. Plaintiff claims that Officer Somero failed to protect Reddie from Deputy Klepadlo's excessive use of force. As just explained, however, viewing the facts in the light most favorable to the two officers, Deputy Klepadlo's use of force was not excessive. Accordingly, on that view of the facts, Officer Somero cannot be liable for failing to protect Reddie.

### ii.

That leaves Defendants' motion for summary judgment. This inquiry requires changing focus and viewing the facts in the light most favorable to Plaintiff and the decedent, Reddie.

Viewing facts in the light most favorable to Reddie, there is no genuine dispute about the reasonableness of Deputy Klepadlo's actions. As just explained above, there is no dispute in the evidence that Reddie was shot from a downward trajectory consistent with him lunging. There is also no dispute that a knife was found within six feet of Reddie's body, in the direction of the officers. There is also no dispute that, at the time Reddie allegedly lunged, Deputy Klepadlo believed Reddie was armed with a knife and had no ability to confirm or deny that fact until Reddie was approaching him.

Plaintiff points to evidence in the record that contradicts this narrative. That evidence, although suggestive of a contrary sequence of events, is no more than a "mere scintilla" that does not raise a genuine dispute of material fact. The key pieces of evidence Plaintiff relies upon are: the suggestion by Dr. Croft that Reddie may have been paralyzed in both of his legs; the

testimony of Reddie's neighbor that she could not hear music, shouting, or a gunshot from across the hall; and the fact that the knife in question was found closed six feet away from Reddie.

The facts that Plaintiff relies upon do not create a genuine dispute of material fact because they provide no "affirmative evidence contradicting the [witnesses'] account" of how the shooting unfolded. *Chappell v. City Of Cleveland*, 585 F.3d 901, 910 (6th Cir. 2009). The suggestion by Dr. Croft that Reddie would have collapsed if paralyzed is just that, a suggestion. It is inconsistent with the uniform eyewitness testimony that Reddie stumbled backwards. It is also inconsistent with Dr. Croft's testimony that the bullet entered Reddie from an upward trajectory, consistent with him leaning—and potentially lunging—forward. Likewise, the testimony of Reddie's neighbor, Lucy Trowbridge, tells us nothing about what transpired in the apartment in the seconds prior to the shooting. It serves, at most, to cast doubt on how loud the officers were actually shouting instructions to Reddie in the lead up to the deadly exchange. Finally, the fact that the knife was found closed on the ground does not change the fact that Deputy Klepadlo believed Reddie was armed at the time he opened fire. As explained above, Deputy Klepadlo had no opportunity to confirm that fact before he was faced with a situation that posed a threat of serious bodily harm to him. These facts do not amount to "significant probative evidence tending to support [Plaintiff's] version of the facts." *Id.* at 913.

Plaintiff's reliance on two cases, *Floyd v. City of Detroit*, 518 F.3d 398 (6th Cir. 2008), and *Howser v. Anderson*, 150 F. App'x 533 (6th Cir. 2005), is misplaced. While both cases address the reasonableness of an officer's use of deadly force, they are distinguishable in important ways.

In *Floyd*, the suspect that was shot provided testimony contradicting the testimony of officers. Floyd, the suspect and plaintiff, testified that, contrary to the officers' explanation, he

- 13 -

was unarmed at the time he was shot and actually had his hands out in front of him. *Floyd*, 518 F.3d at 407.The officers had testified that Floyd was armed and fired at them first. One of the officers also testified that he "didn't see [Floyd] take any threatening action" toward the officer or his partner. *Id*. at 409. Under that presentation of facts, the Sixth Circuit concluded that viewing the evidence in the light most favorable to Floyd required denying qualified immunity.

In *Howser*, the Sixth Circuit denied qualified immunity to an officer that shot and killed an arrestee. The Sixth Circuit observed that the officer had alternating explanations for why he shot the decedent. 150 F. App'x at 538. On the record and in his depositions, the officer claimed the shooting was an accident. But when discussing the shooting with the chief of police, the officer claimed the victim had a firearm. The officer also said right after the shooting that he believed the decedent had a gun. The Sixth Circuit stated that "whether Defendant shot the decedent accidentally or intentionally because of Defendant's belief that the decedent had a gun is in dispute." *Id*. Additionally, the Sixth Circuit noted that "other testimony in the record also indicates that the decedent's hands were visible throughout the relevant portions of the struggle." *Id*. Thus, the officer should have been able to confirm that the decedent was unarmed and realized that deadly force was unreasonable.

None of the mitigating circumstances in *Floyd* or *Howser* are present here. There is no evidence that Deputy Klepadlo had an opportunity to verify if Reddie had a knife. The only information he had was Mr. Sharp's exclamation that Reddie had pulled a knife. The suggestion that Deputy Klepadlo could have and should have confirmed if Reddie had a knife as Reddie brought his hands forward in a lunge at Deputy Klepadlo is an unreasonable one.

Additionally, the suggestion that the gunshot paralyzed both of Reddie's legs causing him to collapse immediately requires selecting one of several possibilities offered by Dr. Croft for the

effect of bullet damage to Reddie's spine. Selecting that single possibility requires rejecting other evidence, including concrete conclusions reached by Dr. Croft, that would suggest Reddie did not suffer paralysis in both legs. This evidence includes the trajectory of the bullet that killed Reddie, the fact that only one bullet was fired, abrasions on the back of Reddie's arm suggesting he slid down a wall, and eyewitness testimony that Reddie stumbled backward after being shot.

Next, the claim that Reddie was unarmed, like the decedent in *Howser*, has no meaningful support in the record. Plaintiff claims that the knife's presence on the ground six feet away from Reddie means that Reddie was unarmed. That conclusion is merely speculative. Mr. Sharp's exclamation that Reddie pulled a knife suggests the contrary and, more importantly, means Deputy Klepadlo reasonably believed Reddie had a knife. Nothing in the record supports the idea that Deputy Klepadlo should have known Reddie was unarmed, if indeed Reddie actually was.

Finally, as previously discussed, the testimony of Reddie's neighbor, Ms. Trowbridge, is unhelpful. Plaintiff suggests that Ms. Trowbridge is able to hear any reasonably noisy activity from Reddie's apartment. Plaintiff also argues that Reddie was blaring music, making it difficult for him to hear the officers' directions and leading to general confusion. But Ms. Trowbridge testified that while she did not hear the officers shouting commands to Reddie, she also did not hear any music from Reddie's apartment. Even if we assume that the officers were not shouting commands at Reddie because Ms. Trowbridge could not hear them, her testimony does not have any bearing on whether Reddie lunged at Deputy Klepadlo and if Deputy Klepadlo believed Reddie to have a knife.[2]

---

[2] Plaintiff may argue that the fact that Ms. Trowbridge did not hear any shouts from the officers or Mr. Sharp's exclamation about a knife, the story about Reddie possessing a knife was fabricated. But that argument is untenable. The knife was found near Reddie's body and Reddie's autopsy indicated Reddie was in a forward position when he was shot. The conclusion would also contradict the uniform eyewitness testimony of the shooting.

- 15 -

Viewing the facts in the light most favorable to Plaintiff and Reddie still leads to the conclusion that Deputy Klepadlo acted reasonably in using deadly force against Reddie. As explained above, this conclusion also means Officer Somero cannot be liable for failing to protect Reddie from Deputy Klepadlo's use of force. *See Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997) (requiring a predicate determination of excessive force before a claim of failure to prevent can attach).

## 2.

Even if the evidence supports a conclusion that Deputy Klepadlo used an unreasonable amount of force when he shot Reddie, summary judgment for the officer defendants would still be appropriate.

The question that must be answered at this stage of the qualified immunity analysis is if "in the specific context of this case, [Reddie's] constitutional right to be free from excessive force was clearly established." *Floyd*, 518 F.3d at 407. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Ciminillo v. Streicher*, 434 F.3d 461, 468 (6th Cir. 2006) (internal quotation marks omitted). This does not mean that a prior case must have articulated a constitutional rule in exactly the same circumstances present here. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances").

The operative question is if a reasonable person in Deputy Klepadlo's position would know that the conduct Plaintiff complains of was unlawful. *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011). The parties dispute the manner in which the right at issue must be defined. Plaintiff argues that the Sixth Circuit has held that "the Fourth Amendment prohibits a police

officer's use of deadly force to seize an unarmed, non-dangerous suspect." *Floyd*, 518 F.3d at 407 (quoting *Sample v. Bailey,* 409 F.3d 689, 696 (6th Cir. 2005)) (internal quotation marks omitted). But as explained above, that rule does not appropriately capture the situation in Reddie's apartment. The record, viewed in any light, simply does not support the conclusion that Deputy Klepadlo should have known that Reddie was unarmed (if indeed he was).

Thus, the appropriate question is if it was clearly established that exerting a deadly amount of force against an individual that an officer believes to be armed and posing a threat to the safety of the officer and others violates the Fourth Amendment. It was not clearly established. Actually, the law is to the contrary. *See, e.g.*, *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (establishing that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force"); *Pollard v. City of Columbus, Ohio*, 780 F.3d 395, 403 (6th Cir.), *cert. denied*, 136 S. Ct. 217 (2015) ("*Garner* establishes that law enforcement officers may employ deadly force where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." (internal quotation marks omitted).

Accordingly, based on the facts developed in discovery, Deputy Klepadlo did not violate a clearly established constitutional right. Concordantly, Officer Somero cannot be liable for failure to prevent Reddie's death if Deputy Klepadlo did not act in contravention of the Fourth Amendment.

**3.**

There are, however, unresolved discovery disputes that could affect this limited explanation of the facts. Entry of summary judgment in the individual Defendants' favor could

be premature if further development of the facts corroborated Plaintiff's speculation about the facts or cast doubt about the facts relied upon by Defendants. These issues will be addressed further below.

### C.

Next, Defendants move for summary judgment on Plaintiff's claims against the County of Crawford and the City of Grayling. Plaintiff seeks to impose liability on the municipalities under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).[3]

To survive summary judgment, Plaintiff must demonstrate that the alleged constitutional violation was "a direct result of the [City or County's] official policy or custom." *Napier v. Madison Cnty., Ky.*, 238 F.3d 739, 743 (6th Cir. 2001). To impose liability on the municipalities under an official policy that policy must be the result of "the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403-04 (1997). "Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Id.*

Plaintiff may prove that the City or County maintained an unconstitutional policy or custom through four different "avenues": "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

---

[3] It goes without saying that if there is no underlying constitutional violation, as it is posited above there may not be, *Monell* liability cannot be imposed on the municipalities. This discussion assumes Plaintiff is able to make out a cognizable claim that Reddie's death was the result of a constitutional violation.

Plaintiff alleges that she is able to show that the municipalities failed to properly train or supervise their officers. ECF No. 68 at 31–32.

To prove a claim of inadequate supervision, Plaintiff must show that the municipalities' "failure[s] to train amount[] to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). The failure to supervise theory itself involves a two-step inquiry. The first question "is whether th[e] training [or supervision] program is adequate[.]" *Id*. at 390. "[I]f it is not, the question becomes whether such inadequate training can justifiably be said to represent 'city policy.'" *Id*.

While failure-to-supervise claims are cognizable, a plaintiff "must also show that the municipality lacks such a process out of deliberate indifference for the constitutional violations that may occur as a result." *Amerson v. Waterford Twp.*, 562 F. App'x 484, 492 (6th Cir. 2014). In *Amerson*, a case concerning allegations of excessive force, the Sixth Circuit held that merely presenting evidence that the defendant township "failed to conduct performance evaluations . . . alone is not enough to show deliberate indifference[.]" *Id*. The Sixth Circuit held that to support such a claim a plaintiff would need to present "evidence of a pattern of excessive force, a record of officers going unpunished for excessive force, or other circumstances tending to show that [the township] was aware or could have been aware that [the officer] was prone to unwarranted application of force." *Id*.

Here, Plaintiff presents no additional evidence of the City of Grayling's failure to train or supervise beyond its decision not to conduct regular performance evaluations. This is insufficient under *Amerson*.

As to the County of Crawford, Plaintiff does introduce some additional evidence. First, she alleges that Deputy Klepadlo "consistently ranked the lowest in the areas of performing in

'stress conditions,' knowledge of policies and procedures, and situation management." Pl.'s Resp. Br. 31, ECF No. 68. But this allegation about Deputy Klepadlo's low performance ratings says nothing about the County of Crawford's training or supervision of its officers. Deputy Klepadlo "ranked the lowest in the areas" identified by Plaintiff *relative* to other areas in which he was evaluated. There is no context for Deputy Klepadlo's evaluations and what the expectations were for Deputy Klepadlo in each area of review.

Plaintiff further alleges that Deputy Klepadlo had citizen complaints "filed against him prior to the subject incident for which have [sic] included allegations of unreasonable force." *Id*. But this claim is misleading. Deputy Klepadlo admits that he has had citizen complaints filed against him but he states that only one included an allegation of excessive force. Klepadlo Dep. 121, Ex. A, Pl.'s Resp. Br., ECF No. 68-2. According to Deputy Klepadlo, he had to tase an arrestee three times because the individual was resisting arrest. *Id*. He then states that nothing came of the citizen complaint and no formal complaint was filed. *Id*. at 122. This is not evidence of the County of Crawford's "deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388. Further, it provides no insight into the adequacy or inadequacy of the County of Crawford's training or supervision program.

Lastly, Plaintiff claims that Deputy Klepadlo could not demonstrate basic knowledge of the force continuum (i.e., the proper progression of an officer's use of force). But this suffers from the same infirmity as her prior argument. There is no connection between this claim and any sort of broader training by the department. Nor is it proof of the department's deliberate indifference to the rights of those it polices. At most it demonstrates a poorly educated officer.

Plaintiff argues that the facts of this case are similar to those in *Kammeyer v. City of Sharonville, Ohio*, No. 1:01-CV-00649, 2006 WL 1133241 (S.D. Ohio Apr. 27, 2006). But

*Kammeyer* is inapposite. In *Kammeyer*, four plaintiffs brought a federal civil rights complaint against the City of Sharonville alleging that the city and some of its law enforcement officers "were involved in an alleged conspiracy to cover up facts necessary to prosecute Albert Schuholz . . . for the 1981 murders of [the plaintiffs' respective mothers.]" *Id*. at *1. In denying summary judgment to the municipality the *Kammeyer* court articulated the relevant facts as follows:

> Plaintiffs note that the police chief is the policymaker for the Sharonville Police Department. Nuss was police chief from 1971 to 1990 and Schappa, the present chief, has been so since 1990. Plaintiffs argue that when the evidence is viewed in a light most favorable to them it is apparent that Nuss permitted Cramer to exercise unfettered discretion in conducting murder investigations. The Plaintiffs highlight that Nuss did not review Cramer's decisions, that no policies were in place constraining Cramer's exercise of discretion thus resulting in the custom for the lead detective (*i.e.,* Cramer) to make and implement his own policies regarding murder investigations. The Court agrees with Plaintiffs. Nuss, as the policymaker for the Sharonville Police Department, delegated the authority to Cramer to act as the policymaker in the context of this case while Lead Detective. Thus, Cramer's actions were those of a final policymaker.

2006 WL 1133241, at *11.

The paucity of facts adduced by Plaintiff concerning the policy and practice of the two Municipality Defendants pales in comparison to the allegations presented in *Kammeyer*. Plaintiff has not presented evidence that any of the concerning behavior was the policy of either municipality. She has offered only suggestion and inference based on a record devoid of context. The plaintiffs in *Kammeyer* offered much more and were rightly permitted to proceed past summary judgment.

Yet, despite the Municipality Defendants' otherwise plain entitlement to summary judgment, entry of such will be withheld in light of the unresolved discovery dispute discussed below.

**III.**

Plaintiff's motion for sanctions alleges that Defendants spoliated evidence that could have corroborated Plaintiff's version or versions of the events in Reddie's apartment. According to Plaintiff and her retained expert, both individual Defendants had the equipment to record the audio in William Reddie's apartment on the day in question.[4]

The conclusions of Plaintiff's expert are based in part on a site visit conducted by Plaintiff's counsel and Plaintiff's expert. Plaintiff's expert was permitted, by order of this Court, to search a City of Grayling Police Department computer for any potential records of a file download from Officer Somero's police cruiser. The relevant part of the Court's order read:

> It is further **ORDERED** that Defendant City of Grayling is **DIRECTED** to permit Plaintiff's counsel access to a computer containing such data described above and in accordance with the following criteria:
>
> - Plaintiff is limited to inspecting only one City of Grayling computer. Defendant City of Grayling must ensure that the computer provided has access to all relevant downloads and activity by Officer Somero or any other officer that would have reasonably had access to the video equipment in Officer Somero's cruiser, during the day in question and the following forty-five day period.
>
> - Defense counsel and IT professionals from the City of Grayling must be present during the inspection.
>
> - The inspection must be scheduled on a mutually convenient date and time prior to the close of discovery.
>
> - The search for data is limited to the day of the incident and the forty-five days following the incident. The forty-five day period begins the day after the incident occurred.
>
> - The search is limited to data from Officer Somero's patrol vehicle that is related to the death of William Reddie on February 3, 2012.
>
> - A stipulated protective order must be entered prior to the search.

---

[4] The associated video recorders were car-mounted and so could not capture video from the apartment.

April 15, 2015 Order, ECF No. 51.

On the basis of her retained expert, Plaintiff concludes that Defendants had control over recorded evidence of the confrontation with Reddie and destroyed that evidence. Plaintiff focuses on the audio recording that should allegedly have been made by Officer Somero and the manner in which any audio recording that may have in fact been made was preserved. Ultimately, only a compact disc was produced from Officer Somero's recording device and the CD did not contain a readable file. There is significant dispute between the parties about why the contents of Officer Somero's recording device (transcribed on an SD card) were not properly transferred to the CD.

Defendants argue, in response, that there was never an audio recording because the audio recording function of Officer Somero's cruiser-recording device did not work. In any event, they claim, Officer Somero did not have the requisite control over the evidence to have been responsible for spoliating it. This is because, Defendants explain, Officer Somero had no contact with the SD card or the recording device in his cruiser after the incident. Officer Somero understands that some unknown person from the department downloaded the contents of his cruiser's SD card and burned it to a CD. That CD, Officer Somero believes, was sent to Michigan State Police. Additionally, Defendants argue that any evidence on the SD card is not relevant to Plaintiff's claims against the City of Grayling, so the City cannot be responsible for spoliating evidence.

Plaintiff answers these claims by highlighting a number of misrepresentations allegedly made by Defendants to Plaintiff and her expert. In particular, Plaintiff claims that there is conflicting evidence about what patrol car Officer Somero was using on the day in question. According to Plaintiff, the CD with the unreadable file reflects Officer Somero being in car 2,

but Officer Somero's partner claims he was in car 11. The discrepancy about which car Officer Somero was in directly affects the conclusions reached by Plaintiff's expert, something she recognizes. Thus, Plaintiff makes two claims in her reply: (1) either Officer Somero's recording device was working, as her expert alleges, and the file was either improperly recorded or lost; or (2) Defendants did not comply with this Court's April 15, 2015 Order directing them to produce for inspection "data from Officer Somero's patrol vehicle."

The dispute between the parties poses a problem that must be resolved before the cross-motions for summary judgment and the motions challenging experts may be decided. The Court must make a preliminary determination as to the facts of the alleged spoliation raised by Plaintiff's motion for sanctions before resolving the cross-motions for summary judgment. If the Court decides that the evidence of spoliated material is sufficient to raise a genuine issue of fact and that Plaintiff has a jury-submissible case, the Court will then have to determine, if Defendants are responsible for the spoliation, whether a spoliation instruction should be given to a jury.

Defendants argue that such delay is unnecessary, and that the motion for sanctions can be denied without an evidentiary hearing. According to Defendants, "the Court is to assess each party's degree of culpability, if any." Defs.' Resp. to Mot. for Sanctions 6, ECF No. 21. Defendants argue that the claims for sanctions against each of them must be analyzed individually, and not collectively. Defendants rely on *Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009), for this proposition.

But the law is not so restricted. In fact, in *Adkins*, the Sixth Circuit recognized that the defendant, Wolever, could be subject to sanction even though he did not control the evidence at issue. The relevant question, the Sixth Circuit noted, was if "the preservation of relevant

- 24 -

evidence was *entirely* beyond his control." *Id.* at 653. The Sixth Circuit went on to reiterate, however, the long-recognized rule that a district court has "broad discretion" to craft appropriate sanctions, and that sanctions have a "remedial purpose . . . best adjusted according to the facts and evidentiary posture of each case." *Id.* (quoting *Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999)).

Thus, further inquiry into the creation and preservation, or lack thereof, of any audio evidence of what occurred in Reddie's apartment is necessary. The duty to preserve evidence can attach when an incident occurs, if those involved "should have known that the evidence may be relevant to future litigation." *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553-54 (6th Cir. 2010) (quoting *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998)). It is also fair to allow inquiry into who had actual control of any potential recording. *See Deanda v. Hicks*, No. 13-CV-1203 KMK, 2015 WL 5730345, at *7 (S.D.N.Y. Sept. 30, 2015).

Further, where a police department equips vehicles with recording devices and has a policy governing the use of those devices during interactions with the public, a sanction may be fair when there is a documentable history of the department ignoring repairs that are necessary for the system to properly operate. While such a sanction would not sound in spoliation, it may nevertheless be appropriate if the neglect of the department is particularly egregious. Accordingly, Plaintiff will be permitted to inquire into the operability of Defendant Municipalities' recording systems.

Plaintiff's motion for sanctions may be mooted in part by the fact that Defendants challenge Plaintiff's expert and his opinions. But the merits of that motion would only resolve the underlying claim of spoliation. There is now, based on the representations of Plaintiff's counsel during briefing, another potential basis for sanctions: compliance with the Court's April

15, 2015 Order. Plaintiff claims that the conditions of the site visit conducted by Plaintiff's expert did not comport with the conditions outlined in the April 15, 2015 Order. As a result, Plaintiff argues, Defendant misled Plaintiff's expert to believe certain recordings were from Officer Somero's patrol vehicle. Additionally, Defendant did not reveal the patrol vehicle that Officer Somero was using at the time of the incident.

These two factual issues will need to be resolved at an evidentiary hearing. A hearing will be scheduled so that the parties may present testimony regarding these two issues. Again, for clarity, the issues are, broadly:

> 1. What was the chain of custody over the SD card that would have captured any audio recording from Officer Somero's lapel microphone? What individuals were responsible for recording data from the SD card to the CD that was then provided to the State Police and produced in discovery? What process was used in copying that information? What was the operability of the recording devices in Officer Somero and Deputy Klepadlo's police vehicles? If they were not functioning, how long had they been in that condition? What did the police department Defendants know about the state of the recording units' operability?

> 2. What car was Officer Somero using on the day in question? What, if any recordings exist from that vehicle's recording system during the period set forth in the April 15, 2015 Order? What recordings and what data were made available to Plaintiff's counsel and expert during the site visit ordered in the April 15, 2015 Order? What, if any representations were made by Defendants or their representatives concerning the recordings and data produced for Plaintiff's counsel and expert during that site visit?

The parties will have the opportunity to submit briefs on these issues in advance of the evidentiary hearing. The briefs should aim to cover three topics. First, they should address the substantive questions set forth above. Second, the briefs should address the appropriate standard of evaluating evidence on a motion for sanctions where a preliminary factual determination must be made in conjunction with motions for summary relief. Third, the briefs should explain the evidence that each party will present at the evidentiary hearing and the estimated time it will take

the parties to present that evidence. The parties' opening briefs shall be limited to fifteen pages. The parties' replies shall be limited to seven pages.

## V.

Accordingly, it is **ORDERED** that the parties are **DIRECTED** to appear for an evidentiary hearing on **September 14, 2016 at 2:00 p.m.**

It is further **ORDERED** that the parties are **DIRECTED** to submit supplemental briefs, in compliance with the guidance set forth above, and in accordance with the following schedule:

| | |
|---|---|
| Plaintiff's 15-page Supplemental Brief: | **August 12, 2016** |
| Defendants' 15- page Supplemental Response: | **August 19, 2016** |
| Plaintiff's 7-page Supplemental Reply: | **August 26, 2016** |
| Defendants' 7-page Supplemental Surreply: | **September 2, 2016** |

Dated: August 3, 2016                                   s/Thomas L. Ludington
                                                                   THOMAS L. LUDINGTON
                                                                   United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 3, 2016.

                                   s/Michael A. Sian
                                   MICHAEL A. SIAN, Case Manager