UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MICHELLE VAN BUREN, Personal Representative
for the ESTATE OF WILLIAM REDDIE, deceased
and WILLIAM REDDIE,

                        Plaintiff,                                 Case No. 13-cv-14565

v.                                                Honorable Thomas L. Ludington

CRAWFORD COUNTY, CITY OF GRAYLING,
JOHN KLEPADLO, and ALAN SOMERO,
in their individual and official capacities,

                        Defendants.

_____/

**ORDER SANCTIONING DEFENDANTS FOR SPOLIATION OF EVIDENCE,
GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR DEFAULT
JUDGMENT, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND
DENYING AS MOOT PLAINTIFF'S MOTION FOR RECONSIDERATION**

On August 3, 2016, an opinion and order was entered addressing the parties' cross

motions for summary judgment and determining that judgment for Defendants should be entered

based on the evidence then presented to the Court. However, entry of judgment was withheld

pending an evidentiary hearing based on Plaintiff's assertion that Defendants spoliated evidence.

ECF No. 84. That evidentiary hearing was held on September 14, 2016,[1] November 10, 2016,[2]

and November 28, 2016.[3] Based on the testimony offered at the hearing and the briefing by the

parties, Plaintiff Michelle Van Buren's motion for sanctions will be granted, Defendants' motion

for summary judgment will be granted in part, and Plaintiff's motion for summary judgment will

be denied. The evidence corroborates Plaintiff's contention that Defendants spoliated audio

---

[1] Evid. Hearing Tr. I, ECF No. 108.
[2] Evid. Hearing Tr. II, ECF No. 114.
[3] Evid. Hearing Tr. III, ECF No. 115.

evidence, and accordingly at trial the jury will be instructed that they are to presume that the missing evidence would have favored Plaintiff unless the presumption is rebutted by evidence to the contrary.

## I.

### A.

Plaintiff Michelle Van Buren filed this suit as personal representative of the estate of William Reddie on November 1, 2013. Defendant City of Grayling is a municipality located in Crawford County, which is also a defendant. Deputy Sheriff John Klepadlo[4] of the Crawford County Sheriff's Department and Officer Alan Somero[5] of the Grayling Police Department were also named as defendants. In the complaint, Van Buren alleges that Defendants' use of excessive force and failure to properly train their officers resulted in William Reddie's death. The allegations surrounding Mr. Reddie's death are summarized in the Court's August 3, 2016, order. ECF No. 84. That statement of facts will be adopted as if restated fully herein. For clarity, a brief overview of the allegations will be given.

Because Mr. Reddie is deceased, all allegations regarding what transpired in his apartment come solely from the testimony of the officers and care workers who were present at the time. On February 3, 2012, Defendants Somero and Klepadlo responded to reports of a potential domestic violence incident at Mr. Reddie's home. The officers found no evidence of domestic violence, but, after questioning Mr. Reddie and searching his apartment, the officers discovered that Mr. Reddie had been using marijuana in his home. Somero told Mr. Reddie that he would be reported for using marijuana in front in his minor child, despite Mr. Reddie's indication that his son was sleeping in another room at the time he smoked the marijuana.

---

[4] Klepadlo is the individual who fatally shot Mr. Reddie.
[5] Somero was present at the scene but did not fire the fatal shot. Plaintiff's claim regarding Somero is that Somero did not prevent the use of excessive force by Klepadlo.

Naturally enough, Mr. Reddie was upset during his conversation with the officers. Klepadlo Dep. at 45, ECF No. 68, Ex. A. Based on that report, Child Protective Services visited Mr. Reddie, who admitted to smoking marijuana but refused to consent to removal of his son. Child Protective Services sought and obtained a court order to remove Mr. Reddie's son. Somero, Klepadlo, and two Child Protective Services care workers went to Mr. Reddie's apartment to effectuate the removal.

Upon seeing the officers, Mr. Reddie immediately picked up his son and retreated into the apartment. He repeatedly told the officers he would not allow them to take his son. The officers and care workers followed Mr. Reddie into his apartment, where the situation quickly escalated. The officers testified that Mr. Reddie was five to ten feet away from them, separated by a coffee table. They further testified that Mr. Reddie was playing loud music and they believed he was preparing himself to fight.

Defendant Klepadlo testified that he drew his Taser and pointed it at Mr. Reddie. Around the same time, the care workers removed Mr. Reddie's son from the apartment. Soon after Klepadlo drew his Taser, one of the care workers shouted that Mr. Reddie had a knife. In response, Klepadlo holstered his Taser and drew his handgun. The officers testified that they told Mr. Reddie to drop the knife, but he did not do so. Mr. Reddie then came out from behind the coffee table. The officers testify that they told Mr. Reddie they would shoot if he did not comply with their orders.

According to the officers, Mr. Reddie raised his hands to shoulder height and moved towards the officers (described as a "lunge"). Klepadlo fired at Mr. Reddie, who died instantly.

The only living witnesses to the events in Mr. Reddie apartment are Somero, Klepadlo, and the two care workers. The testimony of those four witnesses is consistent. Based in large part

- 3 -

on that testimony, and because Plaintiff had not raised sufficient other evidence to cast doubt on that testimony, the Court concluded on August 3, 2016, that summary judgment for Defendants was appropriate pending resolution of the evidence spoliation claims.

**B.**

Plaintiff's motion for spoliation sanctions, ECF No. 57, arises from the dispute about whether audio recordings of the events leading to Mr. Reddie's death exist. Officer Somero's vehicle was equipped with audio/visual recording equipment on the day in question. Defendants later provided the Michigan State Police a single compact disc, purportedly containing the recordings from the incident. The state police found that the compact disc was unreadable. Because Defendants did not produce any of the requested audio or visual files, Plaintiff filed a motion to compel access to Defendant City of Grayling's computers to search for audio or visual recordings of the incident. ECF No. 44. On April 15, 2015, the Court ordered Defendants to allow Plaintiff's consultant, Ed Primeau, to inspect the City of Grayling's computer system. ECF No. 51.

Mr. Primeau visited the Grayling Police Department on May 15, 2015, in accordance with the Court's April 15, 2015, order. Primeau Rep. at 4, ECF No. 85, Ex. E. Upon arriving, Mr. Primeau was informed that the computer system had been replaced subsequent to Reddie's death, resulting in the destruction of all stored audio/visual data which was not transferred to the new system. *Id.* Despite this setback, Mr. Primeau directed a Grayling Police Department employee to search the new computer for relevant data under Mr. Primeau's supervision. *Id.* The search revealed a number of videos recorded from a vehicle identified as GPD01 on February 3, 2012 and February 6, 2012. Although Mr. Primeau testified that the Grayling Police Department employees who were present stated that Defendant Somero was in GPD01 on the day of the

incident, Primeau Dep. at 29, ECF No. 85, Ex. L; Evid. Hearing Tr. III at 124, 127, ECF No. 115, Defendants contend that Defendant Somero was in GPD02 and that no contrary representations were ever made. *See* Def. Resp. Supp. Br. At 13; Eifert Aff. at 1, ECF No. 73, Ex. 6; Baum Aff. at 1, ECF No. 73, Ex. 8; Evid. Hearing Tr. III at 148. The parties now appear to agree that Defendant Somero was in Grayling police car number two, identified as GPD02, on the day of the incident. *See* Pl. Supp. Br, at 5, ECF No. 85; Def. Resp. Supp. Br. At 13, ECF No. 88. Further, the metadata on the otherwise inoperable compact disc indicates that the missing files originated from GPD02.

At the time of the incident, the Grayling Police Department had a verbal policy that officers were to record all interactions with a citizen. Baum Dep. at 30–31, ECF No. 85, Ex. A. Although Officer Somero's car was equipped to record both audio and video, Defendants assert that the car could not have captured video of the encounter with Mr. Reddie given the car's location in the parking lot. Def. Resp. at 5, ECF No. 62. Plaintiff does not appear to contest that representation. Accordingly, the primary issue is whether an audio recording of the altercation with Mr. Reddie was created and, if so, what happened to the audio files after Mr. Reddie's death. A secondary issue is whether Klepadlo's vehicle was equipped with recording equipment on the day in question.

## C.

Defendants suggest that a bizarre series of errors resulted in the failed attempt to maintain the SD card that was the memory device for the vehicular system, the subsequent failed effort to transfer or burn the information on the SD card to the compact disc, and the absence of any other electronic or physical records of the audio/visual recordings made during the Reddie incident. Upon review of all evidence presented, that argument cannot reasonably be accepted.

**1.**

At the time of the Reddie shooting, Grayling Police Department vehicles were equipped with recording systems sold and maintained by ProVision Video Systems. Evid. Hearing Tr. III at 5–6. The system included an in-car video camera and a lapel microphone. *Id.* at 28. The lapel microphones would start recording when a button on the mike was activated. *Id.* At that point, the microphone would record until it was turned off or until the battery was depleted. *Id.* In 2012, ProVision sales literature represented that the lapel microphones would record audio for approximately 1500 feet if unobstructed and about 500 feet if obstructed. *Id.* at 22–23.

Each Grayling Police officer was assigned a SD card which plugged into the ProVision recording system in the vehicle and saved the recordings. Evid. Hearing Tr. I at 34. Typically, a Grayling Police Department officer would eject the SD card from the vehicle at the end of his or her shift. Evid. Hearing Tr. II at 53. The SD card would then be inserted into a SD card reader. *Id.* At that point, the recording files would be accessible on the computer. The officers would have the choice of directly burning the files from the SD card to a CD or saving the files to the computer hard drive. *Id.* at 55. According to Grayling Police Department officer Amanda Clough, she would typically review the recordings for significant incidents to determine if the audio and video were "of use." *Id.* at 67, 75–78. In other words, Officer Clough would only review the recordings for incidents during her shift that she concluded were important and would only save the recordings if the audio/visual files were intelligible. Somero also testified that, after a shift, he would review the recordings to determine which ones he wanted to save and file. Evid. Hearing Tr. I at 41, 62. If the officers chose not to save recording files, they were simply left on the SD card. The officer would use the same SD card for the next shift, and eventually the old files would be overwritten by new recordings. *Id.* at 62.

Somero testified that the in-car video camera in his vehicle was working around the time in question. *Id.* at 11. However, he testified that the audio recording functionality "had been problematic." *Id.* According to Somero, the audio recording was hit or miss; sometimes it would work and sometimes it would not. There was no way to know if the recording system had captured a given incident until the files were played at the end of the shift. *Id.* at 29–30. Officer Clough was sharing a vehicle with Somero, on alternate shifts, during the time period in question. Evid. Hearing Tr. II at 49. She testified that the system was "more miss" than hit and that she never obtained any audio from the lapel microphone. *Id.*[6]

Chief Baum testified that there were "operational issues" with the ProVision systems. *Id.* at 72. When asked what those issues were, Chief Baum stated that he did not know. *Id.* When asked if he had reviewed any documents or records in the past three years that might refresh his memory about those issues, he stated "I have not reviewed any of that." *Id.* When asked if records of those issues might exist at all, he stated "I don't personally have records of that, no." *Id.* When asked if there might be any other person with records of the equipment issues, Chief Baum stated "I don't know that there would - - that there would be any." *Id.*

### 2.

Somero testified that, on the day of the Reddie shooting, he activated his recording device prior to both visits with Mr. Reddie. Evid. Hearing Tr. I at 12, 34. Somero also testified that he believed the in-car video was working but not the audio. *Id.* at 15. After Mr. Reddie was fatally shot, Somero remained at the apartment. *Id.* at 36. Once additional officers arrived, Somero was assigned to guard the apartment door. *Id.* During the approximately forty-five minutes Somero was securing the scene, he did not return to his vehicle. *Id.* Eventually, Grayling Police Chief

---

[6] Notably, Officer Clough also testified that she would save recordings only if there was audio of the incident. *See id.* at 53.

Baum told Somero to report to the Grayling Police Department and await questioning by the Michigan State Police (MSP). *Id.* Somero drove his vehicle, by himself, back to the department. *Id.* at 37. He testified that he followed normal procedures for handling the SD card: he removed the card from the system, gathered his other equipment, and set everything down on his office desk. *Id.* Somero denies ever moving the SD card off that desk and particularly denies putting the card into a computer. *Id.* at 38. Somero waited alone in his office for an unknown period of time. *Id.* at 63. Somero testified that he was interviewed by the MSP and began writing his statement that evening. *Id.* at 39. According to Somero, when Chief Baum and the MSP detective arrived to interview him, he informed Chief Baum that the SD card was present. *Id.* at 64. Somero testified that he does not remember whether he handed the card to the Chief or simply referred to the presence of the card. *Id.* Regardless, Somero testified that he physically furnished the card to Chief Baum. *Id.* at 65. *See also* Somero Dep. at 157–59, ECF No. 85, Ex. B. According to Somero, he has not seen the SD card since that evening. Evid. Hearing Tr. I at 65. He further testified that he never talked to any other person about the SD card. *Id.* at 44–45.

Chief Baum's account of events is different. He testified that he does not have "memory of exactly how" the post-incident events occurred. *Id.* at 84. However, he did assert that "I did not make a copy of it because I did not have the knowledge to do that." *Id.* Chief Baum further stated that he did not know what happened to the SD card and that he did not have a memory of ever seeing it. *Id.* When asked if he ever handled it, Chief Baum said, "Not that I remember." *Id.* When asked if he had ever represented that the SD card had been given directly to the MSP, Chief Baum denied any knowledge of making that representation. *Id.* at 84–85. At the evidentiary hearing, Chief Baum was asked whether the SD card should have been handled with a proper chain of custody. *Id.* at 89. He admitted that it should have been and that leaving the SD

- 8 -

card lying on a desk would violate chain of custody principles. *Id.* He also admitted that, to the best of his recollection, the SD card was in Grayling Police Department custody when taken out of Somero's vehicle. *Id.* at 90.

Detective Rick Sekely was the investigating MSP detective. *Id.* at 125. He testified that he received a compact disc which purportedly contained the recordings from Somero's car on March 1, 2012, twenty-seven days after the Reddie shooting occurred. *Id.* at 126. Detective Sekely was never given the SD card and never discussed the SD card during his investigation. *Id.* at 126–27. Detective Sekely requested a copy of the recordings from Chief Baum on the night of the shooting. *Id.* at 127. He testified that, when questioned about the recordings, both Chief Baum and Somero stated that there would be no audio, but that "we'll see if there's video."[7] *Id.* at 128. Detective Sekely also testified that Chief Baum told him that the manufacturer helped the department download the SD card to the compact disc. Evid. Hearing Tr. II at 38. ProVision has no records of doing so and Defendants have not provided any other substantiation for this theory.

The conflicting stories regarding who had possession of the SD card is reflected in Defendants' counsel's representations regarding the SD card. In Defendants' Surreply to the Motion for Summary Judgment,[8] they stated that "it is undisputed that, after the incident, Officer Somero gave the SD card from his assigned vehicle to Chief Baum." ECF No. 98. However, on January 29, 2015, Defendants' Counsel sent a letter to Plaintiff's counsel which represented the following:

> Chief Baum advises me that Officer Somero never downloaded the information from the SD Card into the Grayling Police Department computer. Rather, when he spoke to the MSP detectives and they asked about the video, Officer Somero

---

[7] Detective Sekely did not investigate independently to confirm that the audio recording equipment in Somero's vehicle was nonfunctional. *Id.* at 129.
[8] This sequence of briefing was ordered by the Court in the August 3, 2016, order which concluded that summary judgment for Defendants was appropriate pending resolution of the evidence spoliation claims. ECF No. 84.

> retrieved the video in the form of the SD Card from his vehicle and gave it
> directly to the MSP detectives. The SD Card is no longer in our possession.

Letter Regarding Subpoenas, ECF No. 85, Ex. D.

According to Detective Sekely, he asked for a copy of the recordings from Somero's vehicle during his initial investigation of the shooting. Evid. Hearing Tr. I at 127.[9] Detective Sekely did not receive the recordings, in the form of a compact disc, until March 1, 2012.[10] According to Detective Sekely, Chief Baum contacted him when the disc was available. *Id.* at 138. Detective Sekely traveled to the Grayling Police Department and picked up the compact disc along with some paper reports. *Id.* Detective Sekely is unsure if Chief Baum came out to greet him. *Id.* Several days later, Detective Sekely tried for the first time to play the files on the disc. *Id.* He was unable to get the files to play, despite trying several different computer programs. *Id.* at 139. Detective Sekely then emailed Chief Baum and asked if a special program was needed to view the files. *Id.* at 141. Chief Baum did not respond, and Detective Sekely never followed up. *Id.* The identity of the person who burned the compact disc remains unknown.

### 3.

The SD card is not the only missing evidence. The computer that Grayling Police Department officers used to download the SD cards was replaced after the incident. *Id.* at 92. Chief Baum was unable to remember exactly when the old computer was replaced with a new one. *Id.* at 123. Plaintiff sent a "Notice to Preserve Evidence" to the Grayling Police Department on April 13, 2012. *Id.* at 97. When presented with the document at the evidentiary hearing, Chief Baum denied any memory of receiving the document. *Id.* However, he did admit that the notice contained the police department's correct address. *Id.* Chief Baum admitted that he might have

---

[9] Chief Baum does not remember who he talked to at the scene and did not recognize Detective Sekely in court. *Id.* at 120.
[10] Metadata contained on the compact disc indicates that the disc was not burned until February 28, 2012, almost four weeks after the shooting. Hearing Tr. III at 44.

received the notice and indicated that it might be "in the file." *Id.* at 123. The Court then asked, "what do you mean it could be in the file? Don't you know today whether it is in the file?" *Id.* Chief Baum admitted, "I did not pull the file prior to coming today." *Id.* The Court inquired: "Have you ever pulled the file before coming today?" *Id.* at 124. Chief Baum replied: "It's been a number of years since I've looked at that file." *Id.* at 124.

When the evidentiary hearing was continued several weeks later, the Court again inquired whether the Grayling Police Department was representing that it had never received the notice to preserve evidence. Evid. Hearing Tr. II at 6. Defendants' counsel responded: "I'm sorry to say that I can't answer that right now. I know what he testified to. . . . And if he looked, he didn't tell me whether he found it or not. We specifically have not talked about that since the date of our last hearing." *Id.* at 7. The Court then directed Defendants' counsel to ask Chief Baum about the issue. *Id.* After doing so, Defendants' counsel made the following representation: "[T]he City of Grayling has no record of receiving - - and, again, I don't have the actual paper in front of me that was alleged to have sent to them. They have a Freedom of Information Act request from Mr. Trainor's office dated March 26th, 2012." *Id.*

Although the Defendants were unsure when, exactly, the old computer where the SD cards were downloaded was replaced, the computer the Grayling Police Department now uses has two folders containing files from the old computer. Evid. Hearing Tr. III at 82, 144. Those folders are entitled "Old PC" and "Old Computer." *Id.* at 82. Those folders were created in September 2012, which indicates that the old computer was still functioning at that time, at least. *Id.* at 82, 144. As discussed below, those folders do not contain the missing recording files from Somero's car.

The Grayling Police Department has also subsequently replaced the ProVision system with a new recording system. Evid. Hearing Tr. I at 116. Significantly, Chief Baum testified that the new recording system was chosen, at least in part, because it did away with officers handling their SD cards. *Id.* at 117. Chief Baum also stated that he decided to replace the ProVision system because of the previously mentioned (but not specified) technical issues. *Id.* at 104–06. When asked if the decision to replace the system had anything to do with the Reddie shooting, Chief Baum responded "[t]hat had a lot to do with that incident and other incidents." *Id.* When asked if the department had experienced other issues with officers handling SD cards, Chief Baum replied: "We had a couple that were lost . . . or misplaced, I should say." *Id.*

**4.**

Based on the missing SD Card, unreadable compact disc, and replaced computer, Plaintiff sought a court order permitting entry onto City of Grayling property to search the Grayling Police Department computer for recordings from the Reddie shooting. ECF No. 44. The Court granted that motion to compel in part. ECF No. 51.

Pursuant to that court order, Plaintiff's expert Edward J. Primeau visited the Grayling Police Department in May of 2015. Evid. Hearing Tr. III at 80. According to Mr. Primeau, when he arrived at the police department, he was told that he could not touch the computer. *Id.* at 83. Rather, Caleb Eifert, an IT professional associated with the Grayling Police Department, insisted on being the one to input commands into the computer. *Id.* at 83–84. However, Mr. Primeau acknowledges that he was able to direct Mr. Eifert to search for specific keywords, was able to take snapshots, and was otherwise allowed to conduct the search to his satisfaction. *Id.* at 84–85. Mr. Primeau retrieved 92 files which were dated February 3 and February 6, 2012. Each file contained an audio/visual recording from a vehicle identified as GPD01, but none contained

audio of the shooting. *Id.* at 88. According to Mr. Primeau, Chief Baum and Mr. Eifert told him that Somero was in GPD01 on the day in question. *Id.* 82–83. Defendants strongly contest that point now. *See* Def. Post Evid. Br. at 5, ECF No. 116. *See also* Pl. Supp. Br, at 5, ECF No. 85; Def. Resp. Supp. Br. At 13, ECF No. 88. Regardless, Mr. Eifert testified, and Plaintiff does not appear to dispute, that the search parameters would have returned all audio/visual recordings for the date in question, regardless of the vehicle they were from. Evid. Hearing Tr. II at 170. In other words, Mr. Primeau was unable to find any recordings from Somero's car regarding the Reddie shooting. Mr. Primeau found no audio problems or other defects in the 92 recordings from GPD01 made in early February. Evid. Hearing Tr. III at 89–90.

**5.**

During the evidentiary hearing, witnesses testified about the operation of the ProVision system and interpreted the metadata found on the otherwise inoperable compact disc. Plaintiff's expert, Edward Primeau, has worked in the audio/video surveillance field for over thirty years. *Id.* at 62. In that time, he provided audio/video authentication and enhancement services, as well as evidence recovery services. *Id.* at 63. At the evidentiary hearing, Mr. Primeau explained that although the compact disc provided to the MSP did not contain any audio/visual files, it contained "metadata." *Id.* at 65. According to Mr. Primeau, metadata is "information about the file such as when it was created, the system it was created on, the date it was created, the size of the file." *Id.* at 66. This metadata can be found using special software programs. *Id.*

The compact disc provided to the MSP contained fourteen ".xspf files." *Id.* at 69. These files act as a kind of directory or playlist: they point towards the location of the underlying audio/visual recordings. *Id.* These .xspf files are generated by the VLC Player software, a media

player used by the Grayling Police Department.[11] *Id.* at 71. According to Mr. Primeau, .xspf files are created through a multi-step process. First, an audio/visual file must be accessed on a computer. *Id.* at 72. Second, the file must be opened in the VLC Player. *Id.* Third, a playlist file had to be created via the VLC Player, named by the user, and then saved. *Id.* Mr. Primeau was able to recover metadata contained in the .xspf files which provided information about the underlying but now missing audio/visual recording files. *Id.* at 72. First, he explained that each of the 14 .xspf files were renamed by a user and contained "Reddie" in the filename. *Id.* at 72–73. He further testified that the metadata indicated that each recording was exactly five minutes long[12] and that all fourteen recordings were created on February 3, 2012. *Id.* at 73. The metadata also revealed that the recordings were from GPD02. In summary, Mr. Primeau testified that the metadata showed that fourteen audio/visual recordings, which were each five minutes long, were made on February 3, 2012. *Id.* at 74. Those recordings were then opened in the VLC Player and fourteen playlist files were created. *Id.* Those playlist files, but not the actual audio/visual files, were then saved to the compact disc that was provided to the MSP. *Id.* When asked to confirm that the metadata proved that audio/visual recordings existed at some point in time, Mr. Primeau explained that VLC Player would not be able to make or save the playlist files unless there was an audio/visual file. *Id.* at 75–76. In order to have functionality, VLC Player must open an actual audio/visual file. *Id.* However, he admitted several times that there was no way to know

---

[11] Mr. Primeau later provided additional information about the software: VLC Media Player is "a software program that interprets audio and video information from a digital format into an analog format so that you could see it and hear it."

[12] Mr. Primeau testified that all of the ProVision recordings he recovered or reviewed metadata for were five minutes in length. *Id.* at 112. He postulated that a new recording was automatically initiated every five minutes to prevent the recording of the entire incident from being lost if a certain section of the recording became corrupted. *Id.* at 113, 130. When asked if this feature would safeguard against some kinds of human error—specifically, removing the SD card from the computer before all the files had finished burning to the CD—he agreed that all files which had finished downloading would remain on the CD. *Id.* at 113–14.

conclusively whether the recordings made in this instance contained both video and audio or only video. *Id.* at 116, 140.

Mr. Primeau further testified that, if a user was attempting to burn audio/visual recordings from an SD card to a disc, loading the files in VLC Player is both unnecessary and "clunky." *Id.* at 76. Instead, a user could simply insert the SD card into the computer, insert a blank disc, and directly copy the files from the SD card or computer to the disc. *Id.* When asked what the use of the VLC Player indicated to him, Mr. Primeau opined:

> It indicates to me that the operator of this process was very knowledgeable of taking data, putting it onto a computer and being able to open it and view it in a player, that wasn't the Pro-Vision player, and save it as a playlist file, and create a name for it to help organize all of the content.

*Id.* at 78.

Mr. Primeau also testified that Grayling Police Department officers sometimes utilized the simple two step approach rather than unnecessarily using the ProVision software. *Id.* at 85–86. During his search of the Grayling Police Department computer, Mr. Primeau found evidence that, on December 5, 2012, an individual logged into Officer Somero's account "created a video disk by dragging and dropping files from an SD card to his computer and then from the computer onto a compact disc." *Id.* at 86. As already mentioned, Mr. Primeau recovered 92 recording files from GPD01 when he searched the Grayling Police Department computer. *Id.* at 132. He testified that none of the files were .xspf files, meaning that the person who downloaded the files did not use the VLC Player to transfer the files. *Id.*

Mr. Primeau was asked why an individual would choose to use VLC Player to transfer recordings from an SD Card to a compact disc. *Id.* at 87. He explained that using VLC Player was "pretty much unnecessary," and that the only reasons he could think were "to rename the files" or "view the files." *Id.*

- 15 -

Detective Wesley Smith[13] also testified at the evidentiary hearing. He confirmed that the metadata on the compact disc indicated that someone had to affirmatively name the underlying audio/visual files. *Id.* at 39. He also provided several possible reasons why the compact disc might include the .xspf pointer files but not the actual recording files: equipment failure, operator error, or intentional deletion. *Id.* 41–43. He admitted that the .xspf files indicated that audio/visual recording files had existed at some point, meaning that equipment failure was an unlikely explanation. *Id.* at 43. At least, the existence of the pointer files indicated that there was not a complete failure of the recording system. Detective Smith further testified that, after talking with two other MSP computer specialists, he concluded that user error was the most likely explanation for the missing files. *Id.* at 51–52. When asked how he concluded that user error was the likely explanation, Detective Smith explained that, given the metadata on the disc, equipment failure was unlikely. *Id.* at 56. He further opined that intentional deletion was unlikely because there were better ways to destroy data than to create the .xspf pointer files. *Id.* at 58.

**6.**

The witnesses who testified about the operation of the ProVision and VLC Player systems agree that some files (in this case, the .xspf files) are saved onto the computer when a compact disc is burned. *See* Evid. Hearing Tr. III at 31–32, 47–48, 52, 121. Even if the user does not affirmatively save the recording files to the computer hard drive, the files will be saved in the computer's temporary directory prior to burning the compact disc. *Id.* Although files in the temporary directory are not automatically saved by the computer (and thus are eventually overwritten), computer experts are frequently able to recover files stored in the temporary directory. *Id.* at 48, 54. However, because the files in the temporary directory were not

---

[13] Detective Smith leads the MSP's internet crimes office.

transferred to the Grayling Police Department's new computer, there is no way to recover any remaining fragments that might have existed on the old computer. *Id.* at 54, 95–96.

**D.**

Defendants contend that Deputy Klepadlo's vehicle was not equipped with an operable recording system on the date in question. Def. Resp. Supp. Br. at 8–9. *See also* Sekely Supp. Rep. at 1; Wakefield Dep. at 21–22, ECF No. 85, Ex. F.

When questioned at the evidentiary hearing, Sheriff Wakefield explained that the Crawford County Sheriff's office had consistently experienced problems with the recording systems in use at the time of the Reddie incident. Evid. Hearing at 103–105. The recording system utilized VHS tapes which were stored in the back of the vehicle. *Id.* Sheriff Wakefield explained that, because the police vehicles would consistently drive over rough, dusty roads, the systems would constantly break. *Id.* Commonly, the eject button on the VHS casing would become stuck, thus preventing the officer from retrieving the tape. *Id.* at 105, 107.

Klepadlo testified that, on the day of the Reddie shooting, his vehicle had a nonfunctional recording system in the trunk. *Id.* at 79. Specifically, the eject button was broken, thus preventing removal of the tape. *Id.* at 96. Klepadlo stated that the system would not record because the tape was not removable, but did not explain why the inability to retrieve the tape resulted in an inability to record audio and video in the first place. Klepadlo explained that his car was towards the end of its working life and thus "was not going to be getting fixed or repaired." *Id.* at 81. Klepadlo further stated that, because the system was nonoperational, he would not have been wearing a lapel mike in the day in question. *Id.* at 88.

According to Sheriff Wakefield, the recording system in Klepadlo's car became, to the best of his recollection, inoperable near the end of January 2012. *Id.* at 111. He also

acknowledged that the system might have been inoperable for longer than that if Klepadlo had not reported the problem. *Id.* at 111–12. In 2011, an eject button on a recording system in one of the Sheriff Department's vehicles was repaired. L-3 Mobile Repair Record, ECF No, 85, Ex. J. When asked why only one repair record existed, Sheriff Wakefield explained "we just had numerous problems with [the recording systems], and when they broke down, we just didn't use them anymore, because I knew I was in the process of trying to procure some money to buy new systems." *Id.* at 107.

Sheriff Wakefield further testified that he personally checked the recording system in Klepadlo's vehicle the evening of the Reddie shooting. *Id.* at 112. He represented that he told Rick Sekely, the Michigan State Police investigator, that the recording system was not functioning. *Id.* at 114. He denies telling Detective Sekely that Klepadlo's vehicle was *not* equipped with a recording system. *Id.* at 115. Detective Sekely testified, however, that Sheriff Wakefield informed him that Klepadlo's vehicle did not have a recording system at all. Evid. Hearing I at 130. Detective Sekely did not ask to personally inspect Klepadlo's vehicle, and Sheriff Wakefield did not suggest that Sekely should. *Id.* at 133–34; Evid. Hearing II at 114.

On April 13, 2012, the Crawford County Sheriff's Department received a notice to preserve evidence related to the Reddie shooting. Evid. Hearing II at 116. The vehicle Klepadlo was driving on the day in question is no longer in use. The current whereabouts of the car and recording system are unknown, but Sheriff Wakefield testified that the recording system was likely "melted down and used for something else by now." *Id.* at 128. Sheriff Wakefield was unable to provide the date, even approximately, when the vehicle was decommissioned and the recording system was destroyed, but suggested that it was unlikely that it happened before the notice to preserve evidence was received. *Id.* at 120. Despite that admission, Sheriff Wakefield

also testified that he did not make an effort to retain the vehicle and recording system. *Id.* at 127. He acknowledges that maintaining the broken equipment, as proof that the system was inoperable, might have been important, but stated that "once I realized [the system] was broke, honestly it meant nothing to me after that." *Id.* at 128–29.

## II.

As a preliminary matter, Defendants argue that sanctions are not appropriate under Federal Rule of Civil Procedure 37 because that rule does not govern pre-litigation destruction of evidence. Plaintiff contends that she is not seeking sanctions under Federal Rule of Civil Procedure 37. Pl. Suppl. Reply Br. at 1, ECF No. 92. However, the Court has the discretionary power to sanction for evidence spoliation independent of Federal Rule of Civil Procedure 37. *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009).

> To justify spoliation sanctions, Plaintiff has the burden of demonstrating:
>
> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind"; and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

An obligation to preserve evidence arises when the party "'should have known that the evidence may be relevant to future litigation.'" *Byrd v. Alpha All. Ins. Corp.*, 518 F. App'x 380, 384 (6th Cir. 2013) (quoting *Beaven*, 622 F.3d at 553). *See also Ross v. Am. Red Cross*, 567 F. App'x 296, 303 (6th Cir.) (upholding denial of spoliation sanctions because defendant lost the evidence prior to learning of the potential lawsuit). The culpability element is satisfied if the evidence was destroyed knowingly or negligently. *Beaven*, 622 F.3d at 554 (quoting *Residential Funding Corp.*, 306 F.3d at 108). There is no requirement that the destruction occur with the

intent to breach a duty to preserve. *Id.* Finally, destroyed evidence is relevant to the moving party's claim or defense if the party makes "'some showing indicating that the destroyed evidence would have been relevant to the contested issue.'" *Id.* (quoting *Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir. 1998)). Although the party seeking sanctions may "'rely on circumstantial evidence to suggest the contents of destroyed evidence,'" *id.* at 555 (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 110 (2d Cir. 2001)), the evidence must be sufficient for "'a reasonable trier of fact [to] find that it would support that claim.'" *Id.* at 554 (quoting *Residential Funding Corp.*, 306 F.3d at 107).

### III.

Because Plaintiff is making a separate spoliation claim against Defendants Crawford County and Deputy Klepadlo than she is making against Defendants City of Grayling and Officer Somero, the Defendants must be analyzed separately. Plaintiff argues that Defendants City of Grayling and Officer Somero should be sanctioned because the Defendants failed to retain the original recording files or create a compact disc containing the recordings. Plaintiff also argues that Defendants Crawford County and Deputy Klepadlo should be sanctioned for spoliation because they either failed to preserve and turn over the recordings from Deputy Klepadlo's car or because they ignored necessary repairs. Pl. Supp. Reply. at 7. Both sets of Defendants utilized different recording systems and neither set of Defendants had access to the other's system.

### A.

The majority of Plaintiff's argument for spoliation sanctions focuses on the compact disc provided by Defendants City of Grayling and Officer Somero that included metadata but no actual recordings. Accordingly, that argument will be analyzed first.

# 1.

The initial question is whether the City of Grayling and Officer Somero had control over the evidence and a duty to preserve it. There can be no dispute that Defendants had an obligation to preserve any potential recordings of the circumstances leading to Mr. Reddie's death. Defendants' current position is that it did not receive the notice to preserve evidence which Plaintiff sent several weeks after the incident. Based on Chief Baum's testimony at the evidentiary hearing, however, there is reason for skepticism about that representation. If, as Chief Baum nonchalantly represented, he has not reviewed the file containing documents relevant to the Reddie incident for several years, then perhaps the department simply misplaced or forgot about the notice. Regardless, Defendants admit that they did receive the Freedom of Information Act request which Plaintiff sent in March 2012. If nothing else, that document provided clear and unmistakable notice that Plaintiff was considering litigation in connection with the shooting and death.

Even if Defendants had not received either notice, they would still have had an obligation to preserve audio/visual recordings of the shooting. When police officers are involved in a fatal shooting, investigation of the events should be expected. Here, all involved parties knew that there would be an investigation into whether the officers involved in the shooting used excessive force, and the possibility of Mr. Reddie's estate bringing suit must also have been anticipated. Police officer recording devices exist, in large part, exactly for situations like this one, where the officers involved in the fatal shooting are the only witnesses. *See Peschel v. City Of Missoula*, 664 F. Supp. 2d 1137, 1145 (D. Mont. 2009) (reasoning that "the obvious inherent value of the video recording" is that it would have allowed the jury to determine whether excessive force was

used without relying solely on witness testimony).[14] Given the gravity of the situation, the Defendants had a manifest duty to ensure that any potential recording of the incident was preserved.

Likewise, the City of Grayling and Officer Somero both had control over the recording system and SD Card. As discussed above, there is conflicting testimony regarding who downloaded the information on the SD Card and transmitted the files to the Michigan State Police. However, there is no dispute that Officer Somero ejected the SD card from the recording system in his car. Even if Officer Somero was not the one to download the card's contents to the Grayling Police Department computer and then burn the disc, he had control over the evidence at perhaps the most crucial moments: during and immediately after its creation. Even under alternative theories, like the proposition that Officer Somero turned the SD card over to Chief Baum or that Chief Baum then worked with a Pro-Vision representative to download and transmit the data, the City of Grayling clearly had control over the evidence during the transfer and download process. And Somero's testimony establishes that he spent a significant period of time alone with the SD card. Parties can be held liable for evidence spoliation even where they were not personally responsible for the loss of the evidence. *See Adkins*, 692 F.3d at 505 (collecting cases). Despite promulgating several different theories, Defendants cannot conclusively state who took custody of the SD card, where the SD card is now, or who downloaded the SD card to the compact disc. This shell game cannot be reasonably accepted. If Defendants' argument was adopted, it would incentivize police departments to store evidence

---

[14] Defendants argue that *Peschel* is legally and factually distinguishable. First, Defendants argue that the decision in *Peschel* was based in part on Federal Rule of Civil Procedure 37. Although the court in *Peschel* does consider Rule 37 in making its determination, the court's reasoning is instructive regardless of the basis for the sanctions. *Peschel* is factually analogous because it involves a claim for excessive force brought against police officers where a recording of the incident existed but was lost. Defendants argue that there is no proof that a recording ever existed here, but the rationale regarding evidence spoliation sanctions outlined in *Peschel* is instructive regardless. More importantly, there is conclusive proof, discussed below, that a recording of some kind *did* exist.

carelessly and maintain minimal records. Defendants cannot avoid responsibility for their failure to preserve what is potentially the best evidence of what occurred in Mr. Reddie's apartment by disclaiming knowledge or records. Plaintiff has satisfied her burden of establishing that Defendants City of Grayling and Officer Somero had control and possession of the evidence.

## 2.

The next question is whether Defendants lost or destroyed the evidence with a culpable state of mind. As already established, negligence is sufficient to justify sanctions. *Beaven*, 622 F.3d at 554 (quoting *Residential Funding Corp.*, 306 F.3d at 108). Defendants argue extensively that Plaintiff has not provided evidence which shows that Defendants are culpable in the loss or destruction of the recording. That is inaccurate. The testimony at the evidentiary hearing established the following facts.

Somero triggered the recording system prior to entering Mr. Reddie's apartment. The metadata on the compact disc provided to the MSP indicates that several recordings which contained audio or video (or both) were made by the recording system in GPD02 on the day in question. The metadata further shows that the compact disc was burned on February 28, 2012. Evid. Hearing Tr. III at 70. The metadata does not indicate whether the recordings included audio from the lapel microphone. Detective Sekely requested copies of the recording files within several days of the shooting. Defendants have not provided an explanation for the delay in burning and providing the disc to the MSP. Likewise, Defendants have not explained where the SD card was during those three weeks or who eventually burned the disc. However, Chief Baum testified that he did not have the technical knowledge to copy an SD card. Evid. Hearing Tr. I at 84. Thus, a recording existed at one point and the Grayling Police Department had possession of the SD card containing those files for several weeks.

Defendants argue that the recording could not have contained audio of the incident, but that assertion is inaccurate. Both Somero and Chief Baum have consistently represented that Somero's lapel microphone was not working on the day of the incident, but they have presented no additional evidence of that assertion. Defendants have produced no repair records or requests for repairs. At the time of the shooting, ProVision's sales literature represented that lapel microphones would record audio at distances of up to 500 feet even if obstructed by buildings. The testimony of Somero, Chief Baum, and Officer Clough is insufficient to establish that Somero's lapel microphone recorded nothing, especially considering Somero's testimony that the lapel microphone sometimes did work.

Further, the metadata on the disc indicates that the files were opened through VLC Player and renamed to include "Reddie" in the title. Mr. Primeau testified that using VLC Player is unnecessary if the user is simply trying to download the files onto a disc. Rather, loading an audio/visual file in VLC Player is useful only if the user is renaming the files or viewing the files. Here, it seems highly likely that whoever burned the disc also viewed the recordings. If the user already knew which files were connected with the shooting, then there would be no reason to open them in VLC Player and rename them. Rather, the user could have simply burned the files directly to the disc (the easier and apparently typical method used by Grayling police officers). Opening the files with VLC Player is thus only necessary if the user needed to view the recordings. Given that likelihood, the failure to properly burn the audio/visual files to the disc is especially troubling. Perhaps the user mistakenly copied only the .xspf files and not the audio/visual files to the disc. But it seems exceedingly unlikely that the Grayling Police Department did not confirm that the disc contained the recording files before turning the disc over to the MSP, much less discarding the SD card.

Officers might be careless when burning discs in the context of a relatively immaterial incident. But this situation involved a fatal shooting which the MSP was investigating. Defendants contend that the sequence of improbable events—the broken equipment, missing SD card, improperly burned disc, replaced computer, and absence of repair records—are the result of negligence, not purposeful destruction. But the simplest explanation for the missing recordings, taking all evidence into account, is deliberate spoliation. Even if Defendants were merely negligent (and there can be no doubt that Defendants' behavior exceeded mere negligence, even if it does not rise to intentional misconduct), negligence is enough to justify sanctions.[15] In short, the most reasonable conclusion is that Defendants Somero and City of Grayling destroyed the missing evidence with a culpable state of mind.

**3.**

Finally, the recording evidence that was lost was relevant to Plaintiff's claims. An audio recording of the incident with Mr. Reddie would be especially helpful because the only other witnesses are the officers and social workers who were present at the shooting. Because the officers are defendants in this case, they do not furnish an impartial perspective on what occurred. *See Peschel v. City Of Missoula*, 664 F. Supp. 2d 1137, 1145 (D. Mont. 2009) (reasoning that "the obvious inherent value of the video recording" is that it would have allowed the jury to determine whether excessive force was used without relying solely on witness testimony). An audio recording of the encounter would easily resolve many of the questions

---

[15] Defendants argue that: "the City did not have a culpable state of mind, especially considering: (1) that it was understood that there was no recording from Somero's lapel mike; and (2) the City produced to the MSP what it believed was a copy of the SD card, but later learned that it had simply made a technical error." Post-Hearing Br. at 4, ECF No. 116. The first argument is addressed above. Defendants' second argument is likewise inaccurate. Besides improperly copying the SD card, Defendants also failed to back up the SD card and then lost the SD card itself. This blatant disregard for chain of custody and other evidence protection procedures far exceeds mere "technical errors." Defendants' argument would also require the Court to believe that Defendants did not test the disc before giving it to the MSP and disregards the fact that Chief Baum did not respond when Detective Sekely asked why the disc was inoperable.

about Mr. Reddie's death, including whether Mr. Reddie was complying with officer instructions, whether Mr. Reddie was acting belligerently, and whether anyone shouted that Mr. Reddie had a knife.

Defendants argue that the missing recording files could not be relevant because the audio recording was not working and, alternatively, because the system would not have recorded accurately considering the distance and obstructions impairing the signal. But Somero testified at the evidentiary hearing that the audio recording worked sometimes.[16] He further testified that it was impossible to know whether audio had been recorded until the files were reviewed on a computer. But he denies ever opening or reviewing the recordings of the shooting. Defendants do not argue that Mr. Reddie's apartment was further than 500 feet from Somero's vehicle, which is the distance ProVision indicated that its system would record through obstructions. Somero also testified that he switched the microphone on before the shooting. Thus, it is reasonably likely that audio of the shooting was recorded. For that reason, Somero's and Chief Baum's confidence now and at the time of the shooting that no audio was recorded is more than puzzling. Unfortunately, the missing files makes it impossible to confirm whether audio was recorded. If the audio/visual files on the SD card had been preserved, determining whether the lapel microphone worked would have been simple. The in-car recording, which Defendants admit was recorded, would either contain the lapel microphone audio or would only contain the in-car audio. *See* Evid. Hearing Tr. II at 58.

In the August 3, 2016, opinion and order concluding that summary judgment for Defendants was appropriate (but withholding entry of judgment pending the evidentiary hearing on evidence spoliation), the Court emphasized that Klepadlo could reasonably have believed that

---

[16] Officer Clough testified that the lapel microphone never worked in GPD02. But no records of repair requests have been produced. Further, Officer Clough testified that she always required help to download files from SD card to a compact disc. Evid. Hearing Tr. II at 56–57. She also admitted to not being "tech savvy." *Id.*

Mr. Reddie was armed. Plaintiff, anticipating that argument, asserted that Mr. Reddie was not armed during the crucial moments because the knife was found, closed, almost six feet away from his body. Plaintiff further speculated that Mr. Reddie dropped the knife after being ordered to do so. The Court rejected that argument, reasoning that the knife's positioning was also consistent with Mr. Reddie dropping the knife after he was shot. The Court continued:

> [E]ven assuming both of Plaintiff's conclusions about the knife in Reddie's apartment—that Reddie did not possess it and that it was always closed—are true, they do not affect the result in this case. Reddie's actual possession of the knife is not relevant, based on the facts as they existed in Reddie's apartment, to determining whether Deputy Klepadlo used a constitutionally reasonable amount of force. That is because a reasonable officer in Deputy Klepadlo's position would believe that Reddie had a knife because [one of the care workers] shouted that he did and he would have had no ability to verify that fact before being faced with a rapidly developing situation.

August 3, 2016, Op. & Order at 9, ECF No. 84.

The recording from Somero's car would have potentially provided unbiased and incisive evidence regarding the most relevant and contested facts in this case. It might have revealed whether someone actually shouted that Mr. Reddie had a knife. If no one did, then Klepadlo would not have had a reasonable basis for believing Mr. Reddie was armed. The recording might also have indicated whether the officers commanded Mr. Reddie to drop the knife. If Mr. Reddie responded to the officers (perhaps by denying that he had a knife, or confirming that he had dropped the knife), those words might have been recorded. The recording might also undermine (or corroborate) Defendants' testimony that Mr. Reddie was playing loud music and acting belligerently. If a recording was found which contained audio evidence of this type, serious questions about the validity of the testimony given by the Defendant officers and care workers would be raised. And, because the testimony given by the Defendants would no longer stand unrebutted, summary judgment would not be entered for Defendants.

Accordingly, the missing recording would have been highly relevant to Plaintiff's claims. *See Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 519 (D.N.J. 2008) ("In a case of one person's word against the word of another, the unbiased eye of a surveillance camera would lend a great deal of credibility to one side's version of the events."); *LaJocies v. City of N. Las Vegas*, No. 2:08-CV-00606-GMN, 2011 WL 1630331, at *2 (D. Nev. Apr. 28, 2011) (holding that the missing videotape was relevant, even though it likely would have shown only a portion of the altercation, because it "could have *potentially assisted* the jury" in understanding what happened) (emphasis added).

Because all three elements of the *Beaven* test are met, sanctions for evidence spoliation will be imposed against Defendants City of Grayling and Somero. The form of those sanctions, and the interrelation between the sanctions and the outstanding motions for summary judgment, will be discussed below.

## B.

Plaintiff argues that sanctions against the City of Grayling and Somero are justified on alternative grounds because those Defendants did not comply in good faith with the Court's April 15, 2015, discovery order. First, Plaintiff argues that the Defendants did not allow Mr. Primeau to physically inspect the computer, as ordered by the Court. Second, Plaintiff argues that Defendants misled Mr. Primeau regarding whether certain recordings were from Mr. Somero's vehicle. Regardless of whether Plaintiff's representations are accurate, sanctions are not necessary.

Testimony at the evidentiary hearing established that Caleb Eifert, a technology consultant for the Grayling Police Department, physically input commands at Mr. Primeau's direction during the search. Neither Defendants nor Mr. Primeau argue that Mr. Eifert refused to

comply with Mr. Primeau's directions or otherwise hindered the search. In one instance, Mr. Eifert input broader search criteria than directed, but Mr. Primeau acknowledged that Mr. Eifert's search would have encompassed all information sought by Mr. Primeau's originally requested search terms. Plaintiff has not provided any evidence that they were prejudiced by the way the search was conducted.

There is a factual dispute regarding whether Chief Baum and other City of Grayling employees told Mr. Primeau that Somero was in GPD01 on the day in question. Even if Defendants informed Mr. Primeau that the recordings came from Officer Somero's car, Defendants have since clarified which car Officer Somero drove on the day in question and which car the recordings came from. *See* Pl. Supp. Br, at 5, ECF No. 85; Def. Resp. Supp. Br. At 13, ECF No. 88. There is no evidence that any false information that might have been conveyed to Mr. Primeau during the search prejudiced Plaintiff. All parties now agree that Somero drove GPD02 on the day of the shooting. The parties also agree that Defendants do not have possession of the recordings from GPD02 on that day. Any misrepresentations made by Defendants during the search have had no impact on Plaintiff's case. Defendants will not be sanctioned for noncompliance with the Court's April 15, 2015, order.

## C.

Plaintiff also argues that spoliations sanctions are justified against Defendants Crawford County and Klepadlo. Plaintiff has not provided any evidence that Crawford County or Deputy Klepadlo had any access to the recording equipment in Officer Somero's vehicle or were involved in the alleged spoliation of the recordings on the compact disc. Thus, Plaintiff's only argument that Crawford County and Deputy Klepadlo engaged in evidence spoliation is that they did not turn over recordings from Deputy Klepadlo's vehicle. But Sheriff Wakefield testified at

the evidentiary hearing that the Crawford County Sheriff's office had experienced continuous problems with the recording systems installed in the car. Both Klepadlo and Sheriff Wakefield testified that the system was inoperable on the day of the shooting.[17] More importantly, Klepadlo testified that, because the system was nonfunctional, he was not wearing his lapel microphone. Plaintiff has not offered evidence to suggest that a recording ever existed. Rather, Plaintiff argues that Crawford County and Klepadlo spoliated evidence because they failed to keep the recording system in working order while installed and then did not retain possession of the equipment after they replaced the recording system.

Plaintiff has not provided sufficient evidence of wrongdoing under either theory to justify spoliation sanctions. As regards Plaintiff's failure to repair theory, Plaintiff is effectively arguing not that Crawford County failed to preserve existing evidence, but rather that Crawford County's inaction resulted in no evidence being generated in the first place. Although police officer recording equipment is an important and helpful innovation, Plaintiff has offered no support for the assertion that Crawford County was under an obligation to keep the recording system in working order at all times. Parties have an obligation to preserve evidence once they learn it may be relevant to future litigation, *Byrd*, 518 F. App'x at 384, but they do not have a duty to ensure that relevant evidence is created in the first place, especially when the incident giving rise to the litigation has not yet occurred. Plaintiff has not provided any evidence which suggests that Crawford County's decision to not immediately repair its recording equipment was made to prevent Plaintiff from accessing relevant evidence. Accordingly, Crawford County's decision to not repair its recording equipment does not necessitate spoliation sanctions.

---

[17] Detective Sekely testified that Sheriff Wakefield told him that there was no recording equipment in the vehicle. Sheriff Wakefield contends that he simply told Detective Sekely that the equipment was inoperable.

Likewise, even though Crawford County later replaced its recording system and did not retain possession of the old equipment, spoliation sanctions are not justified. Plaintiff has not provided any evidence that even suggests that Deputy Klepadlo's recording system contained any relevant information. Crawford County has never indicated that a recording of the Reddie incident existed. Because Klepadlo was not wearing his lapel microphone, no such recording could exist. Absent some evidence that the recording system included relevant information, Plaintiff cannot show that Crawford County had an obligation to preserve the replaced equipment or that the decision to replace the equipment was made with "a culpable state of mind." *Beaven*, 622 F.3d at 553. Accordingly, Crawford County and Deputy Klepadlo will not be sanctioned for evidence spoliation.

Even though the actions of Crawford County and Klepadlo did not constitute evidence spoliation under the *Beaven* test, the Court is concerned about two remaining subjects. First, there is a factual dispute regarding whether Sheriff Wakefield told Detective Sekely that there was no recording system in Klepadlo's car. According to Detective Sekely, Sheriff Wakefield told him that there was no system and Detective Sekely recorded that fact in his report. Detective Sekely relied upon Sherif Wakefield's representation and did not independently search the vehicle. Klepadlo's representation that he was not wearing a lapel microphone during the shooting stands uncontested, so the dispute over what exactly Detective Sekely was told is not material. But the uncertainty regarding whether Klepadlo's vehicle was equipped with a recording system contributed to the MSP's investigation and presumably to its conclusion that the shooting was justified. Second, Crawford County should have retained Deputy Klepadlo's vehicle. Sheriff Wakefield admitted that his office received the FOIA request and notice to preserve evidence from Plaintiffs and then subsequently disposed of the recording system. Even

if no recording was ever made, Crawford County should have maintained possession of at least the recording system to prove that it was inoperable. If Crawford County had maintained the evidence, it would have put itself above reproach as regards the spoliation allegations.

## IV.

Because Plaintiff has demonstrated that the City of Grayling and Somero spoliated evidence, the next question is what degree of sanctions are appropriate. "District courts have broad discretion to craft proper sanctions for the spoliation of evidence." *Adkins v. Wolever (Adkins II)*, 692 F.3d 499, 503 (6th Cir. 2012) (citing *Adkins v. Wolever (Adkins II)*, 554 F.3d 650, 652 (6th Cir. 2009)). Spoliation sanctions should be tailored to serve both "fairness and punitive functions." *Adkins*, 554 F.3d at 652. Further, the severity of the sanction should correspond to the party's culpability. *Id.* A party who is unable to produce evidence because the party intentionally destroyed it will be treated more harshly than a party who lost the evidence negligently. Appropriate sanctions can range from granting summary judgment, *Adkins*, 554 F.3d at 653, to imposing a rebuttable presumption that the "missing evidence would favor the non-spoliating party*," One Beacon Ins. Co. v. Broad. Dev. Grp., Inc.*, 147 F. App'x 535, 541 (6th Cir. 2005)), or simply instructing the jury that they may infer the "missing evidence would favor the non-spoliating party." *Id.* The *One Beacon* court described the rebuttable presumption as a "'middle ground' approach appropriate for negligent loss of evidence" and described the inference instruction as a "particularly mild sanction for spoliation." *Id.*

As discussed above, Defendants' actions exceed mere negligence. At best, Defendants were remarkably reckless. At worst, Defendants intentionally destroyed evidence which might have provided the only objective account of what occurred in Mr. Reddie's apartment. If there was no evidence other than the testimony provided at the evidentiary hearing, entry of summary

judgment for Plaintiff might well be justified. However, the August 3, 2016, opinion and order considered all of the available evidence of the events in Mr. Reddie's apartment. In that order, the Court concluded not only that summary judgment should not be entered for the Plaintiff, but that summary judgment for the Defendants was appropriate, pending the outcome of the evidentiary hearing. Defendants' actions regarding the recordings from Somero's car suggest that the recordings undermined Defendants' theory regarding the shooting, but the unlawfulness of the shooting has not been conclusively established. Given the absence of other evidence of excessive force, summary judgment will not be entered for Plaintiff.

Rather, a rebuttable presumption that the destroyed recordings would have favored Plaintiff will be imposed. The jury will be instructed that Defendants destroyed the recordings from Somero's vehicle. The jury will be further instructed that Defendants bear the burden of proving that the contents of the recordings would not have favored Plaintiff. This sanction is appropriate for two reasons. First, Sixth Circuit precedent describes the rebuttable presumption sanction as a middle-ground in cases of negligent destruction of evidence. As already explained, Defendants' actions exceed mere negligence, meaning that this sanction is, if anything, a more modest remedy. Second, Defendants have repeatedly professed ignorance during this evidentiary dispute. Defendants purport to have no idea who took possession of the SD card, where the SD card is now, who burned the disc, when the computer was replaced, when the ProVision system was replaced, or whether the department received a notice to preserve evidence. It is unclear whether Defendants' inability to answer so many questions is the result of grossly incompetent recordkeeping or purposeful obfuscation. What is clear is that Defendants should not be allowed to profit from the missing information. Accordingly, Defendants will bear the burden of

persuading the jury that the recordings would not have favored Plaintiff's theory of excessive force.

## V.

Several issues remain. The City of Grayling and Somero are being sanctioned, but Crawford County and Klepadlo did not spoliate evidence. Accordingly, the interaction of the sanctions with Plaintiff's claims against Crawford County and Klepadlo must be determined. Additionally, the outstanding motions for summary judgment must be resolved. Finally, Plaintiff's motion for reconsideration of the Court's August 3, 2016, order must be resolved.

## A.

If the presumption that the recordings from Somero's vehicle would support Plaintiff's claims is not rebutted at trial, then the jury could reasonably find that Somero is liable for failing to prevent the use of excessive force. *See Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008) (explaining that an officer who fails to prevent the use of excessive force can be held liable when the officer had reason to know excessive force was being used and had the opportunity and means to prevent the harm). Accordingly, granting Somero's motion for summary judgment would be unjustified. Further, summary judgment cannot be entered for Klepadlo. Klepadlo did not engage in evidence spoliation. However, Klepadlo was the officer who fired the fatal shot. If the presumption that the missing recording would have revealed evidence supporting Plaintiff's claims stands, and the jury finds against Somero, that conclusion would necessarily involve a determination that Klepadlo acted with excessive force. It would further mean that the jury did not believe Klepadlo's sworn testimony regarding what occurred in Mr. Reddie's apartment. The rebuttable presumption, in combination with Plaintiff's other evidence of officer misconduct, thus raises a genuine issue of material fact regarding whether

Klepadlo acted with excessive force and whether Somero failed to stop that use of excessive force. Summary judgment cannot be granted for the individual Defendants.

## B.

However, Plaintiff's only claim against the City of Grayling and Crawford County is that their policies, procedures, or customs resulted in deprivation of Mr. Reddie's constitutional rights under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). As explained in the August 3, 2016, opinion and order, "Plaintiff has not presented evidence that any of the concerning behavior was the policy of either municipality." ECF No. 84 at 21. Even if the jury decides that excessive force was used against Mr. Reddie, that conclusion would establish only a single incident of unconstitutional action by city and county employees. Because a single incident does not by itself constitute an unconstitutional custom, the rebuttable presumption will not create a material issue of fact as to whether the City of Grayling or Crawford County violated *Monell*.

Although Plaintiff may argue that Defendants' apparently longstanding practice and custom of ignoring needed repairs to recording equipment constitutes a *Monell* violation, there is insufficient authority for that proposition. Indeed, because there is no constitutional requirement that police departments utilize recording systems, a failure to repair existing systems can hardly be unconstitutional. More importantly, Plaintiff's Second Amended Complaint does not allege that Crawford County and the City of Grayling violated *Monell* by not repairing their recording systems.

Finally, Plaintiff could potentially argue that the testimony at the evidentiary hearing revealed a policy and practice by the City of Grayling police of destroying adverse evidence in criminal investigations. However, the evidentiary hearing established only one instance of

evidence spoliation, albeit in several different stages. And Plaintiff's Second Amended Complaint does not allege that the City of Grayling violated *Monell* via a policy of evidence spoliation. For those reasons, that claim is not before the Court. But such a claim might exist, especially if, as Chief Baum admitted at the hearing, SD cards were "misplaced" by Grayling Police Department officers in other cases as well. Regardless, that question cannot be resolved because not raised in the allegations in the complaint and the evidence presented. Plaintiff is the master of her complaint and chose not to allege a *Monell* claim based on evidence spoliation. Accordingly, summary judgment will be entered for the City of Grayling and Crawford County.

## C.

For the reasons discussed in the Court's August 3, 2016, order and in Section IV above, Plaintiff's motion for summary judgment will not be granted. Thus, the only remaining motion to resolve is Plaintiff's motion for reconsideration, ECF No. 87, of the Court's August 3, 2016, order. Specifically, Plaintiff is challenging the Court's conclusion that Defendants Somero and Klepadlo should be dismissed, pending the outcome of the evidentiary hearing. Plaintiff's motion for reconsideration will be denied because the motion is moot. At the time Plaintiff filed the motion, neither Somero nor Klepadlo had been dismissed. Rather, the Court declined to enter summary judgment until after the evidentiary hearing on the spoliation issue was held. As explained, summary judgment will not be entered for Somero or Klepadlo. Thus, Plaintiff is asking the Court to reconsider an order which was not actually entered and requesting a remedy which has already been provided on a separate basis.

A motion for reconsideration will be granted if the moving party shows: "(1) a palpable defect, (2) the defect misled the court and the parties, and (3) that correcting the defect will result in a different disposition of the case." *Michigan Dept. of Treasury v. Michalec*, 181 F. Supp. 2d

731, 733-34 (E.D. Mich. 2002) (quoting E.D. Mich. LR 7.1(g)(3)). Here, granting Plaintiff's motion for reconsideration would not result in a different disposition because Plaintiff's preferred disposition has already been ordered.[18] Plaintiff's motion for reconsideration will be denied as moot.

## VI.

Accordingly, it is **ORDERED** that Plaintiff's motion for spoliation sanctions, ECF No. 57, is **GRANTED in part.** The jury will be instructed that Defendant Somero and the Grayling Police Department destroyed the recordings from Somero's vehicle. Defendants will bear the burden of proving that the destroyed evidence would not have favored Plaintiff.

It is further **ORDERED** that Defendants' motion for summary judgment, ECF No. 55, is **GRANTED in part and DENIED in part.**  The Defendants **City of Grayling** and **Crawford County** are **DISMISSED.**

It is further **ORDERED** that Plaintiff's motion for default judgment, ECF No. 57, is **DENIED.**

It is further **ORDERED** that Plaintiff's motion for summary judgment, ECF No. 58, is **DENIED.**

It is further **ORDERED** that Plaintiff's motion for reconsideration, ECF No. 87, is **DENIED as moot.**

It is further **ORDERED** that the Scheduling Order is **AMENDED** as follows:

Pre-trial Disclosures:                               **February 27, 2017**

Motions in Limine:                                   **March 14, 2017**

Final Pretrial Order and Jury Instructions Due:      **April 4, 2017**

---

[18] Even if Plaintiff's motion for reconsideration were not moot, it would be denied. Plaintiff has not shown any palpable defects in the Court's reasoning in the August 3, 2016, order. Rather, Plaintiff merely reasserts arguments and evidence already considered and rejected by the Court as insufficient to create a genuine issue of material fact.

Final Pretrial Conference:                    **April 11, 2017 at 2:00 p.m.**

Trial:                                        **April 25, 2017 at 8:30 a.m.**


Dated: January 17, 2017                    s/Thomas L. Ludington
                                           THOMAS L. LUDINGTON
                                           United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on January 17, 2017.

                              s/Michael A. Sian
                              MICHAEL A. SIAN, Case Manager