UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MICHELLE VAN BUREN, Personal Representative
for the ESTATE OF WILLIAM REDDIE, deceased
and WILLIAM REDDIE,

                Plaintiff,               Case No. 13-cv-14565

v.                                        Honorable Thomas L. Ludington

CRAWFORD COUNTY, CITY OF GRAYLING,
JOHN KLEPADLO, and ALAN SOMERO,
in their individual and official capacities,

                Defendants.

_____/

## ORDER DENYING MOTION TO FILE THIRD AMENDED COMPLAINT, DENYING MOTION TO STAY, AND AMENDING SCHEDULING ORDER

Michelle Van Buren initiated this suit on behalf of William Reddie, who was fatally shot by a Crawford County Sheriff's Department Deputy, John Klepadlo, on February 3, 2012. ECF No. 1. On August 3, 2016, the Court issued an order which concluded that, based on the evidence then presented, summary judgment should be granted for the Defendants. ECF No. 84. Plaintiff contended, however, that the Defendants had spoliated relevant audio evidence of the confrontation leading to the shooting. Accordingly, summary judgment was not entered. During the fall of 2016, three days of evidentiary hearings were held to address the spoliation issue. On January 17, 2017, the Court entered an opinion and order finding that the City of Grayling and Officer Somero spoliated evidence and sanctioning them, reasoning that the "simplest explanation for the missing recordings, taking all evidence into account, is deliberate spoliation." ECF No. 118 at 25. The Court also found that there was no evidence that the Crawford County Sheriff's Department had possession of a recording of the events surrounding the shooting and

declined to sanction Crawford County or Deputy Klepadlo. *Id.* at 29–32. Although Klepadlo had not spoliated evidence and was not being sanctioned, the questions raised by the destroyed audio recordings (in combination with the sanctions imposed against Somero) demonstrated a material question of fact regarding whether Klepadlo shot Mr. Reddie with excessive force and, further, whether Somero should have prevented that use of force. The City of Grayling and Crawford County were dismissed because Plaintiff did not allege a policy and practice of permitting the use of excessive force, meaning that there was no basis for liability under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).[1]

Since the order sanctioning the City of Grayling and Deputy Somero was issued, both parties have sought an interlocutory appeal to the Sixth Circuit. ECF Nos. 119, 123. In their appeal, Defendants argue that Klepadlo was improperly denied the protection of qualified immunity because he did not spoliate evidence. In connection with their appeal, Defendants filed a motion to stay the trial. ECF No. 121. Defendants are attempting an interlocutory appeal as of right, contending that the Court's denial of qualified immunity should be reviewed immediately. On February 16, 2017, Plaintiff filed a motion stylized as a motion for leave to file a third amended complaint which seeks to join new parties and claims related to the evidence spoliation. ECF No. 127. Defendants filed a motion to adjourn trial on February 24, 2017. ECF No. 129. That motion was granted. ECF No. 131.

For the reasons stated below, Plaintiff's motion to file a third amended complaint will be denied. Defendants' motion to stay will also be denied because the argument Defendants are raising on appeal is not an "abstract issue" of qualified immunity law.

**I.**

---

[1] Although Plaintiff might be able to bring a *Monell* claim predicated on the City of Grayling's treatment of evidence, neither the second amended complaint nor the proposed third amended complaint frames such a claim.

The allegations surrounding Mr. Reddie's death and the evidence spoliation were provided in the Court's January 17, 2017, Opinion and Order. ECF No. 118. Part of that summary will be reproduced here:

> Because Mr. Reddie is deceased, all allegations regarding what transpired in his apartment come solely from the testimony of the officers and care workers who were present at the time. On February 3, 2012, Defendants Somero and Klepadlo responded to reports of a potential domestic violence incident at Mr. Reddie's home. The officers found no evidence of domestic violence, but, after questioning Mr. Reddie and searching his apartment, the officers discovered that Mr. Reddie had been using marijuana in his home. Somero told Mr. Reddie that he would be reported for using marijuana in front of his minor child, despite Mr. Reddie's indication that his son was sleeping in another room at the time he smoked the marijuana. Naturally enough, Mr. Reddie was upset during his conversation with the officers. Klepadlo Dep. at 45, ECF No. 68, Ex. A. Based on that report, Child Protective Services visited Mr. Reddie, who admitted to smoking marijuana but refused to consent to removal of his son. Child Protective Services sought and obtained a court order to remove Mr. Reddie's son. Somero, Klepadlo, and two Child Protective Services care workers went to Mr. Reddie's apartment to effectuate the removal.

> Upon seeing the officers, Mr. Reddie immediately picked up his son and retreated into the apartment. He repeatedly told the officers he would not allow them to take his son. The officers and care workers followed Mr. Reddie into his apartment, where the situation quickly escalated. The officers testified that Mr. Reddie was five to ten feet away from them, separated by a coffee table. They further testified that Mr. Reddie was playing loud music and they believed he was preparing himself to fight.

> Defendant Klepadlo testified that he drew his Taser and pointed it at Mr. Reddie. Around the same time, the care workers removed Mr. Reddie's son from the apartment. Soon after Klepadlo drew his Taser, one of the care workers shouted that Mr. Reddie had a knife. In response, Klepadlo holstered his Taser and drew his handgun. The officers testified that they told Mr. Reddie to drop the knife, but he did not do so. Mr. Reddie then came out from behind the coffee table. The officers testify that they told Mr. Reddie they would shoot if he did not comply with their orders.

> According to the officers, Mr. Reddie raised his hands to shoulder height and moved towards the officers (described as a "lunge"). Klepadlo fired at Mr. Reddie, who died instantly.

Jan. 17, 2017, Op. & Order at 2–3, ECF No. 118.

Testimony at the evidentiary hearing established that Defendants City of Grayling and Officer Somero did not preserve any potential audio recording of the incident:

> Somero testified that, on the day of the Reddie shooting, he activated his recording device prior to both visits with Mr. Reddie. Evid. Hearing Tr. I at 12, 34. Somero also testified that he believed the in-car video was working but not the audio. *Id.* at 15. After Mr. Reddie was fatally shot, Somero remained at the apartment. *Id.* at 36. Once additional officers arrived, Somero was assigned to guard the apartment door. *Id.* During the approximately forty-five minutes Somero was securing the scene, he did not return to his vehicle. *Id.* Eventually, Grayling Police Chief Baum told Somero to report to the Grayling Police Department and await questioning by the Michigan State Police (MSP). *Id.* Somero drove his vehicle, by himself, back to the department. *Id.* at 37. He testified that he followed normal procedures for handling the SD card: he removed the card from the system, gathered his other equipment, and set everything down on his office desk. *Id.* . . . Somero testified that he does not remember whether he handed the card to the Chief or simply referred to the presence of the card. *Id.* Regardless, Somero testified that he physically furnished the card to Chief Baum. *Id.* at 65. *See also* Somero Dep. at 157–59, ECF No. 85, Ex. B. According to Somero, he has not seen the SD card since that evening. Evid. Hearing Tr. I at 65. He further testified that he never talked to any other person about the SD card. *Id.* at 44–45.

> Chief Baum's account of events is different. He testified that he does not have "memory of exactly how" the post-incident events occurred. *Id.* at 84. However, he did assert that "I did not make a copy of it because I did not have the knowledge to do that." *Id.* Chief Baum further stated that he did not know what happened to the SD card and that he did not have a memory of ever seeing it. *Id.* When asked if he ever handled it, Chief Baum said, "Not that I remember." *Id.* When asked if he had ever represented that the SD card had been given directly to the MSP, Chief Baum denied any knowledge of making that representation. *Id.* at 84–85. At the evidentiary hearing, Chief Baum was asked whether the SD card should have been handled with a proper chain of custody. *Id.* at 89. He admitted that it should have been and that leaving the SD card lying on a desk would violate chain of custody principles. *Id.* He also admitted that, to the best of his recollection, the SD card was in Grayling Police Department custody when taken out of Somero's vehicle. *Id.* at 90.

Jan. 17, 2017, Op. & Order at 7–8.

The Michigan State Police (MSP) investigated the shooting but did not seize the SD card containing the original audio files or pursue the possibility that the files had been intentionally destroyed:

> Detective Rick Sekely was the investigating MSP detective. *Id.* at 125. He testified that he received a compact disc which purportedly contained the recordings from Somero's car on March 1, 2012, twenty-seven days after the Reddie shooting occurred. *Id.* at 126. Detective Sekely was never given the SD card and never discussed the SD card during his investigation. *Id.* at 126–27. Detective Sekely requested a copy of the recordings from Chief Baum on the night of the shooting. *Id.* at 127. He testified that, when questioned about the recordings, both Chief Baum and Somero stated that there would be no audio, but that "we'll see if there's video." *Id.* at 128. Detective Sekely also testified that Chief Baum told him that the manufacturer helped the department download the SD card to the compact disc. Evid. Hearing Tr. II at 38. ProVision has no records of doing so and Defendants have not provided any other substantiation for this theory.
>
> According to Detective Sekely, he asked for a copy of the recordings from Somero's vehicle during his initial investigation of the shooting. Evid. Hearing Tr. I at 127. Detective Sekely did not receive the recordings, in the form of a compact disc, until March 1, 2012. According to Detective Sekely, Chief Baum contacted him when the disc was available. *Id.* at 138. Detective Sekely traveled to the Grayling Police Department and picked up the compact disc along with some paper reports. *Id.* Detective Sekely is unsure if Chief Baum came out to greet him. *Id.* Several days later, Detective Sekely tried for the first time to play the files on the disc. *Id.* He was unable to get the files to play, despite trying several different computer programs. *Id.* at 139. Detective Sekely then emailed Chief Baum and asked if a special program was needed to view the files. *Id.* at 141. Chief Baum did not respond, and Detective Sekely never followed up. *Id.* The identity of the person who burned the compact disc remains unknown.

Jan. 17, 2017, Op. & Order at 9–10.

Forensic analysis of the disc provided to the MSP strongly suggested that a recording existed at one point, that a member of the Grayling Police Department listened to it, and that the individual then created the disc which was given to the MSP but did not transfer the actual audio recordings onto the disc:

> During the evidentiary hearing, witnesses testified about the operation of the ProVision system and interpreted the metadata found on the otherwise

inoperable compact disc. Plaintiff's expert, Edward Primeau, has worked in the audio/video surveillance field for over thirty years. [Evid. Hearing Tr. III] at 62. In that time, he provided audio/video authentication and enhancement services, as well as evidence recovery services. *Id.* at 63. At the evidentiary hearing, Mr. Primeau explained that although the compact disc provided to the MSP did not contain any audio/visual files, it contained "metadata." *Id.* at 65. According to Mr. Primeau, metadata is "information about the file such as when it was created, the system it was created on, the date it was created, the size of the file." *Id.* at 66. This metadata can be found using special software programs. *Id.*

The compact disc provided to the MSP contained fourteen ".xspf files." *Id.* at 69. These files act as a kind of directory or playlist: they point towards the location of the underlying audio/visual recordings. *Id.* These .xspf files are generated by the VLC Player software, a media player used by the Grayling Police Department. *Id.* at 71. According to Mr. Primeau, .xspf files are created through a multi-step process. First, an audio/visual file must be accessed on a computer. *Id.* at 72. Second, the file must be opened in the VLC Player. *Id.* Third, a playlist file had to be created via the VLC Player, named by the user, and then saved. *Id.* Mr. Primeau was able to recover metadata contained in the .xspf files which provided information about the underlying but now missing audio/visual recording files. *Id.* at 72. First, he explained that each of the 14 .xspf files were renamed by a user and contained "Reddie" in the filename. *Id.* at 72–73. He further testified that the metadata indicated that each recording was exactly five minutes long and that all fourteen recordings were created on February 3, 2012. *Id.* at 73. The metadata also revealed that the recordings were from GPD02. In summary, Mr. Primeau testified that the metadata showed that fourteen audio/visual recordings, which were each five minutes long, were made on February 3, 2012. *Id.* at 74. Those recordings were then opened in the VLC Player and fourteen playlist files were created. *Id.* Those playlist files, but not the actual audio/visual files, were then saved to the compact disc that was provided to the MSP. *Id.* When asked to confirm that the metadata proved that audio/visual recordings existed at some point in time, Mr. Primeau explained that VLC Player would not be able to make or save the playlist files unless there was an audio/visual file. *Id.* at 75–76. In order to have functionality, VLC Player must open an actual audio/visual file. *Id.* However, he admitted several times that there was no way to know conclusively whether the recordings made in this instance contained both video and audio or only video. *Id.* at 116, 140.

Mr. Primeau further testified that, if a user was attempting to burn audio/visual recordings from an SD card to a disc, loading the files in VLC Player is both unnecessary and "clunky." *Id.* at 76. Instead, a user could simply insert the SD card into the computer, insert a blank disc, and directly copy the files from the SD card or computer to the disc. *Id.* When asked what the use of the VLC Player indicated to him, Mr. Primeau opined:

It indicates to me that the operator of this process was very knowledgeable of taking data, putting it onto a computer and being able to open it and view it in a player, that wasn't the Pro-Vision player, and save it as a playlist file, and create a name for it to help organize all of the content.

*Id.* at 78.

Mr. Primeau also testified that Grayling Police Department officers sometimes utilized the simple two step approach rather than unnecessarily using the ProVision software. *Id.* at 85–86. During his search of the Grayling Police Department computer, Mr. Primeau found evidence that, on December 5, 2012, an individual logged into Officer Somero's account "created a video disk by dragging and dropping files from an SD card to his computer and then from the computer onto a compact disc." *Id.* at 86. As already mentioned, Mr. Primeau recovered 92 recording files from GPD01 when he searched the Grayling Police Department computer. *Id.* at 132. He testified that none of the files were .xspf files, meaning that the person who downloaded the files did not use the VLC Player to transfer the files. *Id.*

Mr. Primeau was asked why an individual would choose to use VLC Player to transfer recordings from an SD Card to a compact disc. *Id.* at 87. He explained that using VLC Player was "pretty much unnecessary," and that the only reasons he could think were "to rename the files" or "view the files." *Id.*

Detective Wesley Smith also testified at the evidentiary hearing. He confirmed that the metadata on the compact disc indicated that someone had to affirmatively name the underlying audio/visual files. *Id.* at 39. He also provided several possible reasons why the compact disc might include the .xspf pointer files but not the actual recording files: equipment failure, operator error, or intentional deletion. *Id.* 41–43. He admitted that the .xspf files indicated that audio/visual recording files had existed at some point, meaning that equipment failure was an unlikely explanation. *Id.* at 43. At least, the existence of the pointer files indicated that there was not a complete failure of the recording system. Detective Smith further testified that, after talking with two other MSP computer specialists, he concluded that user error was the most likely explanation for the missing files. *Id.* at 51–52. When asked how he concluded that user error was the likely explanation, Detective Smith explained that, given the metadata on the disc, equipment failure was unlikely. *Id.* at 56. He further opined that intentional deletion was unlikely because there were better ways to destroy data than to create the .xspf pointer files. *Id.* at 58.

Jan. 17, 2017, Op. & Order at 13–16.

## II.

Attempts to add a party to an existing case are governed by Federal Rules of Civil Procedure 15, 20, and 21. After a responsive pleading has been served, "the standard for adding a party is the same regardless of the rule under which the motion is made: the decision lies within the discretion of the court." *Boyd v. D.C.*, 465 F. Supp. 2d 1, 2 n.3 (D.D.C. 2006) (citing *Wiggins v. Dist. Cablevision, Inc.*, 853 F.Supp. 484, 499 n.29 (D.D.C.1994)). *See also Oneida Indian Nation of N.Y. State v. Cty. of Oneida, N.Y.*, 199 F.R.D. 61, 73 (N.D.N.Y. 2000); 6 Fed. Prac. & Proc. Civ. §§ 1474, 1479 (3d ed.).

Federal Rule of Civil Procedure 15(a)(2) provides that a party may amend its pleading with the court's leave and that "the court should freely give leave when justice so requires." Denial of a motion to amend is appropriate, however, "'where there is 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.'" *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

An amendment would be futile if the proposed amended complaint does not state a claim upon which relief can be based. A pleading fails to state a claim under Rule 12(b)(6) if it does not contain allegations that support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009). In considering a Rule 12(b)(6) motion, the Court construes the pleading in the non-movant's favor and accepts the allegations of facts therein as true. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The pleader need not provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555

(2007). In essence, the pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678-79 (quotations and citation omitted).

**A.**

Plaintiff's proposed amended complaint seeks to add two Defendants, City of Grayling Police Chief Doug Baum and Crawford County Sheriff Kirk Wakefield, and two claims, conspiracy under 42 U.S.C. § 1983 and conspiracy under state law. ECF No. 127. Plaintiff asserts that "[t]he interest of justice would be served by allowing the amendments to Plaintiff's Complaint rather than forcing Plaintiff to file a new civil action and incurring additional costs." Mot. Amend at 3.

The differences between Plaintiff's second amended complaint and proposed third amended complaint will be briefly summarized. *Compare* ECF No. 32 *with* ECF No. 127, Ex. A. Besides allegations regarding the shooting, the proposed amended complaint alleges that Klepadlo and Somero were both equipped with audio recording devices on the day of the shooting. Prop. Am. Compl. at 4. Plaintiff asserts that the shooting was recorded onto an SD card which was downloaded onto a City to Grayling Computer. Eventually, a compact disc was created without the underlying audio files. Plaintiff alleges that "the individually-named Defendants destroyed the SD card and computer files" for the purpose defeating subsequent investigations and lawsuits. *Id.* The proposed amended complaint further alleges that Klepadlo's recording equipment saved a recording of the incident to a VHS tape system in his vehicle. According to Plaintiff, the "individually-named Defendants destroyed the VHS tape, VHS recording system, and police vehicle" to obstruct later investigations and lawsuits. *Id.* at 5.

The proposed third amended complaint includes, verbatim, all claims which were included in the second amended complaint, including the *Monell* claim (brought, by definition, only against the City of Grayling and Crawford County). The City of Grayling and Crawford County have been dismissed because the *Monell* claim was deficient. The proposed third amended complaint also contains a conspiracy claim under § 1983 and a conspiracy claim under state law. The substance of the allegations regarding those claims is that each of the individually-named Defendants had an agreement to "destroy the audio recordings, recording operation systems, [and] police vehicles" and conspired "to make false representations of the unlawful actions to law enforcement personnel." *Id.* at 13.

Defendants argue that adding Chief Baum and Sheriff Wakefield as new Defendants would be futile. They also argue that Plaintiff's conspiracy claims are futile. Defendants further argue that the proposed amendment is untimely because discovery has long since closed and the deadline for dispositive motions has likewise passed.

**B.**

Defendants first argue that allowing the amendments would be futile. To prevail on a conspiracy claim, Plaintiff must prove "an agreement between two or more persons to injure another by unlawful action." *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007). To adequately plead a conspiracy, the complaint must allege that "(1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed." *Id. See also Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). "Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985). Importantly,

the pleading standard for conspiracy claims under § 1983 is "'relatively strict.'" *Gavitt v. Born*, 835 F.3d 623, 647 (6th Cir. 2016) (quoting *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 563 (6th Cir. 2011)). "Although circumstantial evidence may prove a conspiracy, '[i]t is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983.'" *Id.*

Plaintiff argues that she has adequately alleged facts sufficient to satisfy each element of a § 1983 conspiracy claim. Plaintiff asserts, first, that a plan to destroy relevant evidence of the shooting existed. Second, Plaintiff asserts that the individually-named Defendants shared that general conspiratorial objective. Third, Plaintiff asserts that an overt act was committed: the destruction of the SD card, computer files, recording systems, and police vehicles.

Defendants argue that the proposed amended complaint does not adequately allege that the Defendants had a single plan to deprive Mr. Reddie of his constitutional rights. *See Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003) ("[T]here is no evidence from which to infer that the defendants acted in concert in so doing. The Spadafores have submitted no evidence, circumstantial or otherwise, suggesting that the defendants had a single plan when they made the allegedly false statements."). Defendants further argue that the circumstantial evidence identified by Plaintiff is just as consistent with independent conduct by the individual Defendants as with a conspiracy. *See Womack v. Conley*, 595 F. App'x 489, 494 (6th Cir. 2014) ("Because these pieces of circumstantial evidence are just as consistent with a legitimate police investigation as with a conspiracy, we find that the district court did not err in holding that the evidence is insufficient to support an inference of conspiracy."). *See also Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012). Finally, Defendants point out that Plaintiff has not identified

in either her proposed amended complaint or in the related briefing which constitutional right she is alleging the Defendants conspired to violate.

Plaintiff's conspiracy claim under § 1983 is cognizable only if Plaintiff alleges that she was deprived of a right secured by the Constitution or laws of the United States. *See Memphis, Tennessee Area Local, Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004). Because Plaintiff has not clearly identified the right Defendants conspired to deprive her of, Defendants presume in their briefing that "the constitutional right at issue is the Decedent's Fourth Amendment right to be free of excessive force during a seizure." Def. Resp. Br. at 6. If that is the basis of Plaintiff's claim, allowing the amendment would be futile. Plaintiff has alleged no facts which would suggest that the Defendants conspired to use excessive force against Mr. Reddie. To the contrary, the allegations (and evidence submitted during summary judgment) indicate that Mr. Reddie was shot during an escalating confrontation. There are no allegations which plausibly suggest that the Defendants conspired beforehand to shoot Mr. Reddie without just cause.

There is no doubt that if the police destroy evidence which would have been exculpatory for a criminal defendant, the defendant's constitutional rights have been violated. *See Moldowan v. City of Warren*, 578 F.3d 351, 381 (6th Cir. 2009) (collecting cases). A fair reading of Plaintiff's proposed amended complaint suggests that the constitutional right at issue is a conspiracy to destroy evidence which would have revealed the use of excessive force against Mr. Reddie. But the evidence spoliation here occurred in the context of a civil suit. There was no criminal investigation (apart from, perhaps, the seemingly perfunctory investigation of the shooting by the MSP). Mr. Reddie's estate is the Plaintiff in this case; he is not a criminal

defendant. The Bill of Rights provides numerous protections for criminal defendants, but does not provide equivalent guarantees for civil litigants.

Plaintiff has not identified nor has an independent search by the Court revealed any authority to support the proposition that spoliation of evidence in a civil case implicates a constitutional right. In fact, it appears that the vast majority of jurisdictions do not recognize a stand-alone cause of action for spoliation claims. *See Teel v. Meredith*, 284 Mich. App. 660, 668, 774 N.W.2d 527, 532 (2009) ("[V]ery few states recognize spoliation of evidence as an independent tort, and those that do have not only faced considerable disapproval, but have varied among themselves in the parameters and application of such a tort."); *Monsanto Co. v. Reed*, 950 S.W.2d 811, 815 (Ky. 1997) ("The Court of Appeals recognized that only three states have adopted this tort claim. The vast majority of jurisdictions have chosen to counteract a party's deliberate destruction of evidence with jury instructions and civil penalties."). The few federal courts to address this question have held that spoliation of evidence does not give rise to an independent claim for relief. *See Turner v. United States*, 736 F.3d 274, 282 n. 5 (4th Cir. 2013) ("Spoliation of evidence, standing alone, does not constitute a basis for a civil action under either federal or admiralty law."); *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) ("[W]hile the spoliation of evidence may give rise to court imposed sanctions deriving from this inherent power, the acts of spoliation do not themselves give rise in civil cases to substantive claims or defenses."); *Lombard v. MCI Telecommunications Corp.*, 13 F. Supp. 2d 621, 628 (N.D. Ohio 1998) ("No court, however, has suggested that an appropriate remedy is damages or other relief pursuant to a separate cause of action.").

Under both federal and Michigan law, civil conspiracy claims are derivative. They are cognizable only insofar as there is an underlying cognizable legal claim. *See Spadafore v.*

*Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *In re Rospatch Sec. Litig.*, 760 F. Supp. 1239, 1265 (W.D. Mich. 1991) ("The focus of a civil conspiracy claim is the damage, not the conspiracy itself. Thus, conspiracy allegations not attached to allegations of a substantive wrong are not actionable."). Plaintiff is advancing claims related to the use of excessive force, but (as explained above) Plaintiff has not adequately alleged that there was a conspiracy to use excessive force. There is no independent cause of action for spoliation of evidence (in a civil case) under federal or Michigan law.[2] Because civil conspiracy actions are derivative of substantive claims of wrong, Plaintiff's proposed conspiracy claims are non-cognizable and allowing the amendment would be futile.

Even if Plaintiff's proposed claims were not futile, there are other reasons to be hesitant to allow the proposed amendment. The case is trial-ready and has been pending since November 2013. Discovery has long since ended, the dispositive motions deadline has passed, and three days of an evidentiary hearing have been held over several months. Plaintiff was aware of the potential evidence spoliation since at least June 26, 2015, when she filed a motion for default judgment based on the spoliation. ECF No. 57. Since then, Plaintiff has received additional information regarding the nature of the evidence spoliation, but that information has largely corroborated the allegations made in the motion for default judgment. Accordingly, the allegations now advanced in the proposed third amended complaint could have been articulated as early as June 2015. Given this case's age, further delay in resolving the excessive force and

---

[2] The spoliation of evidence which occurred here was egregious, especially if (as it appears) it was intentional. However, not all bad faith conduct is actionable under the federal Constitution and statutes. A single instance of evidence spoliation in a civil suit is not violative of a federal right. The Court does not opine on whether a pattern of such actions (especially if the pattern and practice impacted the rights of criminal defendants) might be a violation of federal rights. To the extent Plaintiff might argue that a constitutional right protecting against the intentional spoliation of evidence in civil cases should be created, such a right was not clearly established at the time of the offense. Accordingly, the individual (proposed) Defendants would be entitled to qualified immunity. *See Miller v. Calhoun Cty.*, 408 F.3d 803, 812 (6th Cir. 2005).

related state claims is not warranted. Plaintiff's motion to file a third amended complaint will be denied.

## C.

The remaining issue is whether Defendant Klepadlo's motion to stay pending the outcome of his interlocutory appeal should be granted. Defendant Klepadlo filed an interlocutory appeal on January 24, 2017. ECF No. 119. Defendants concurrently filed a motion to stay proceedings until that appeal was resolved. Plaintiff does not contest the motion to stay.[3] ECF No. 125.

Interlocutory appeals are governed by 28 U.S.C. § 1292. Parties may seek an interlocutory appeal of right of certain orders involving injunctions, certain orders involving receiverships, or of orders which determine the rights and liabilities of parties in admiralty cases. *Id.* at § 1292(a)(1)–(3). None of those circumstances are present here. Additionally, § 1292(b) allows a district judge to certify as appropriate an interlocutory appeal not covered by § 1292(a) if the court believes that the appeal "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." Defendant Klepadlo has not sought certification of his interlocutory appeal, and the Court declines to sua sponte certify the appeal pursuant to § 1292(b).

Instead, Klepadlo relies upon Supreme Court precedent which permits interlocutory appeals of denials of qualified immunity in certain strictly constrained circumstances. In *Mitchell v. Forsyth*, the Supreme Court provided several criteria which must be met for a decision to be

---

[3] Plaintiff has also filed an interlocutory appeal. ECF No. 123. Plaintiff has provided no explanation of why such an interlocutory appeal is justified and the Court can conceive of no legal argument Plaintiff might make (especially considering the fact that she succeeded in advancing past summary judgment as regards the individual Defendants) that would materially advance the ultimate termination of the litigation.

appealable before a final judgment. 472 U.S. 511, 527 (1985). First, the issue must be unreviewable on appeal from a final judgment. *Id.* The Court emphasized that qualified immunity "is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 526. However, non-reviewability is not sufficient, by itself, to justify an interlocutory appeal. Rather, the decision being appealed from must also "'conclusively determine the disputed question'" and "that question must involve a 'clai[m] of right separable from, and collateral to, rights asserted in the action.'" *Id.* at 527. The *Mitchell* Court explained that denials of qualified immunity will often meet all three prongs, at least when the denial of qualified immunity depends on "whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions." *Id.* at 528.

In *Johnson v. Jones*, the Supreme Court confirmed that denials of qualified immunity based on a determination that there were genuine factual issues (as opposed to a decision based on a purely legal analysis) typically do not satisfy the "separability requirement" imposed by *Mitchell.* 515 U.S. 304, 313–15 (1995). The *Johnson* Court concluded that "considerations of delay, comparative expertise of trial and appellate courts, and wise use of appellate resources argue in favor of limiting interlocutory appeals of 'qualified immunity' matters to cases presenting more abstract issues of law." *Id.* at 317. A year later, in *Behrens v. Pelletier*, the Supreme Court further clarified the narrow range of immediately appealable denials of the qualified immunity: "[S]ummary judgment determinations *are* appealable when they resolve a dispute concerning an 'abstract issu[e] of law relating to qualified immunity—typically, the issue whether the federal right allegedly infringed was 'clearly established.'" 516 U.S. 299, 313 (1996) (quoting *Johnson*, 515 U.S. at 317) (emphasis in original) (internal citations omitted).

The Sixth Circuit has likewise interpreted the Supreme Court's decision in this area as creating a very narrow exception allowing for interlocutory appeals. "A defendant who is denied qualified immunity may file an interlocutory appeal with this Court *only if* that appeal involves the abstract or pure legal issue of whether the facts alleged by the plaintiff constitute a violation of clearly established law." *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998) (emphasis added). The *Berryman* Court explained that a right to proceed on an interlocutory appeal of a denial of qualified immunity arises "[o]nly if the undisputed facts or the evidence viewed in the light most favorable to the plaintiff fail to establish a prima facie violation of clear constitutional law." *Id. See See v. City of Elyria*, 502 F.3d 484, 490 (6th Cir. 2007) ("[A] determination that a given set of facts violates clearly established law is reviewable, while a determination that an issue of fact is 'genuine' is unreviewable.") (quoting *Johnson*, 515 U.S. at 311). *See also Baker v. Union Twp.*, 587 F. App'x 229, 232 (6th Cir. 2014) (accord).

District courts are empowered, especially in the context of a motion to stay proceedings, to review interlocutory appeals, certify them as frivolous, and proceed with the case. *See Behrens v. Pelletier*, 516 U.S. at 310; *Yates v. City of Cleveland*, 941 F.2d 444, 449 (6th Cir. 1991). *See also Jennings v. Fuller*, No. 13-13308, 2015 WL 5216714, at *1 (E.D. Mich. Sept. 4, 2015). In this Court's view, Defendant Klepadlo is not entitled to an interlocutory appeal based on his loss of his qualified immunity. Importantly, Klepadlo will be free to raise his challenges to that order on appeal, but the proper time for that appeal will come when a final order has been issued.

Defendant Klepadlo argues that he seeks an appeal because the effect of this Court's order was to deny Klepadlo qualified immunity "by imposing an evidentiary sanction for spoliation on Co-Defendant Somero, which had no relation to Klepadlo's actions." Def. Notice

of Appeal at 2, ECF No. 119. The January 24, 2017, Opinion and Order squarely addressed the

interaction between the imposition of sanctions and the denial of qualified immunity:

> If the presumption that the recordings from Somero's vehicle would support Plaintiff's claims is not rebutted at trial, then the jury could reasonably find that Somero is liable for failing to prevent the use of excessive force. *See Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008) (explaining that an officer who fails to prevent the use of excessive force can be held liable when the officer had reason to know excessive force was being used and had the opportunity and means to prevent the harm). Accordingly, granting Somero's motion for summary judgment would be unjustified. Further, summary judgment cannot be entered for Klepadlo. Klepadlo did not engage in evidence spoliation. However, Klepadlo was the officer who fired the fatal shot. If the presumption that the missing recording would have revealed evidence supporting Plaintiff's claims stands, and the jury finds against Somero, that conclusion would necessarily involve a determination that Klepadlo acted with excessive force. It would further mean that the jury did not believe Klepadlo's sworn testimony regarding what occurred in Mr. Reddie's apartment. The rebuttable presumption, in combination with Plaintiff's other evidence of officer misconduct, thus raises a genuine issue of material fact regarding whether Klepadlo acted with excessive force and whether Somero failed to stop that use of excessive force. Summary judgment cannot be granted for the individual Defendants.

Jan. 24, 2017 Op. & Order at 34–35.

Klepadlo's challenge to that analysis does not justify an interlocutory appeal. Defendant

Somero is not appealing the denial of qualified immunity as to him. But Plaintiff's claim against

Somero is completely derivative of the claim against Klepadlo: if Klepadlo did not use excessive

force, then *a fortiori* Somero cannot be held liable for failing to prevent the use of excessive

force. If the missing videotape and other circumstantial evidence is sufficient to demonstrate a

genuine issue of material fact regarding whether excessive force was used, then neither Somero

nor Klepadlo are entitled to qualified immunity.

Klepadlo simply challenges the fact that sanctions imposed against Somero impacted

Klepadlo's entitlement to qualified immunity. Klepadlo may challenge that result in good faith

on appeal, but it is not a "neat abstract issue[]" of qualified immunity law such that an

interlocutory appeal is appropriate. *Johnson*, 515 U.S. at 317. The sanction imposed against Somero is not the denial of qualified immunity itself. Rather, the sanction is the rebuttable presumption that will be imposed at trial. Klepadlo will be permitted to explain at trial that he did not spoliate evidence. But Klepadlo's entitlement to qualified immunity must be analyzed separately from the spoliation sanctions. The very fact that audio recordings of the shooting were (apparently) willfully destroyed is itself evidence that the recordings would have contradicted (or at least undermined) Defendants' account of what occurred in Mr. Reddie's apartment. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109 (2d Cir. 2002) ("Where a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party."); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 221 (S.D.N.Y. 2003) ("[I]n the case of willful spoliation . . . the spoliator's mental culpability [is] itself evidence of the relevance of the documents destroyed.").

Thus, the fact that evidence spoliation occurred dramatically impacts the tenor of the evidence of what occurred in the apartment. If the jury finds that Defendants have not adequately explained why the destroyed audio recordings would have supported their theory of the case, they could reasonably find that excessive force was used. Accordingly, Klepadlo was denied qualified immunity because there was a genuine issue of material fact regarding whether he shot Mr. Reddie with excessive force.[4] The denial of qualified immunity was thus not premised on an abstract issue of law like whether the law was clearly established that excessive force is

---

[4] Klepadlo is understandably perturbed at the fact that he was denied qualified immunity, after the Court issued an order finding that qualified immunity was likely appropriate, on the basis of misconduct by other Defendants. But had Klepadlo been dismissed based on qualified immunity, an even more bizarre and inequitable result would have become possible. Specifically, the jury might reasonably have concluded that Somero was liable for failing to prevent the use of excessive force by an individual who had been previously dismissed because there was insufficient evidence of excessive force.

unconstitutional.[5] *Johnson*, 515 U.S. at 317. Accordingly, the legal challenge Klepadlo is asserting is not appropriate for interlocutory review.

Additionally, Klepadlo has not shown that a stay of proceedings pending resolution of the appeal is justified. In determining if a stay is appropriate, courts weight four factors: "1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; 2) the likelihood that the moving party will be irreparably harmed absent a stay; 3) the prospect that others will be harmed if the court grants the stay; and 4) the public interest in granting the stay." *Grutter v. Bollinger*, 247 F.3d 631, 632 (6th Cir. 2001). None of the factors support a stay here. For the reasons stated above, Klepadlo's interlocutory appeal does not present a pure legal issue. Accordingly, this Court cautiously opines that the Sixth Circuit will decline to exercise jurisdiction over the interlocutory appeal. Further, the harm to Klepadlo if a stay is not instituted will be minimal. The parties have already finished discovery and engaged in considerable litigation regarding dispositive motions. Klepadlo (and Somero) will be free to raise challenges on appeal after trial. The only difference will be that Klepadlo will have sustained the cost of defending a case at trial. While qualified immunity is a defense from standing trial at all, the additional expense a trial will impose on Klepadlo will be a relatively minor inconvenience compared to the expense already incurred while engaging in discovery, litigating summary judgment motions, and litigating the spoliation issue. In other words, holding the trial will not substantially increase the prejudice Defendants have experienced defending this action. On the other hand, this case has been pending for a significant period of time. Mr. Reddie's estate is entitled to resolution of his claims in a timely manner. Accordingly, the Defendants' motion to stay will be denied and a new trial date will be scheduled.

---

[5] Indeed, the legal conclusion underlying the qualified immunity analysis—that fatally shooting a man who has not given reason for a reasonable officer to fear attack is excessive force—cannot reasonably be challenged.

**III.**

Accordingly, it is **ORDERED** that Plaintiff's motion for leave to file a third amended complaint, ECF No. 127, is **DENIED.**

It is further **ORDERED** that Defendant's motion to stay, ECF No. 121, is **DENIED.**

It is further **ORDERED** that the Scheduling Order, ECF No. 27, is **AMENDED as follows:**

| | |
|---|---|
| Motions in Limine: | **June 13, 2017** |
| Final Pretrial Order & Jury Instructions: | **July 5, 2017** |
| Final Pretrial Conference: | **July 11, 2017, at 2:00 p.m.** |
| Jury Trial: | **July 25, 2017, at 8:30 a.m.** |

It is further **ORDERED** counsel are **DIRECTED** to furnish requests for voir dire and a statement of claims or defenses, as specified in Section XII of the Scheduling Order, ECF No. 27, at least **one week prior to the trial date.**

Dated: April 13, 2017                                    s/Thomas L. Ludington
                                                                    THOMAS L. LUDINGTON
                                                                    United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 13, 2017.

s/Michael A. Sian
MICHAEL A. SIAN