UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MICHELLE VAN BUREN, Personal Representative
for the ESTATE OF WILLIAM REDDIE, deceased
and WILLIAM REDDIE,

                Plaintiff,                          Case No. 13-cv-14565

v.                                              Honorable Thomas L. Ludington

CRAWFORD COUNTY, CITY OF GRAYLING,
JOHN KLEPADLO, and ALAN SOMERO,
in their individual and official capacities,

                Defendants.

_____/

## ORDER DENYING SECOND MOTION TO FILE THIRD AMENDED COMPLAINT AND HOLDING MOTION FOR RELIEF IN ABEYANCE

Michelle Van Buren brought this suit on behalf of William Reddie, who was fatally shot by a Crawford County Sheriff's Department Deputy, John Klepadlo, on February 3, 2012. ECF No. 1. On August 3, 2016, this Court issued an order which concluded that, based on the evidence then presented, summary judgment should be granted for the Defendants. ECF No. 84. However, because Plaintiff was contending that the Defendants had spoliated audio evidence of the shooting, summary judgment was not entered. During the fall of 2016, the Court held three days of evidentiary hearings on the spoliation issue. On January 17, 2017, the Court issued an order concluding that the City of Grayling and Officer Somero spoliated evidence and sanctioning them, reasoning that the "simplest explanation for the missing recordings, taking all evidence into account, is deliberate spoliation." ECF No. 118 at 25.

The Court also found that there was no evidence that the Crawford County Sheriff's Department had possession of a recording of the shooting and declined to sanction Crawford

County or Deputy Klepadlo. *Id.* at 29–32. Although Klepadlo had not spoliated evidence and was not being sanctioned, the questions raised by the destroyed audio recordings (in combination with the sanctions imposed against Somero) demonstrated a material issue of fact regarding whether Klepadlo shot Mr. Reddie with excessive force and, further, whether Somero should have prevented that use of force. The City of Grayling and Crawford County were dismissed because Plaintiff did not allege a policy and practice of permitting the use of excessive force, meaning that there was no basis for liability under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

Defendants have filed an interlocutory appeal of the order sanctioning Defendants. ECF No. 119. Simultaneously with the appeal, Defendants filed a motion to stay the case during the pendency of the appeal. ECF No. 121. On February 16, 2017, Plaintiff filed a motion seeking leave to file a third amended complaint which adds new parties and claims related to the evidence spoliation. ECF No. 127. On April 13, 2017, the Court denied Plaintiff's first motion to file a third amended complaint and denied Defendants' motion to stay. ECF No. 133. As regards the motion to file a third amended complaint, the Court concluded that Plaintiff's proposed civil conspiracy claim was noncognizable and so amendment would be futile. That is because civil conspiracy claims are derivative and thus depend on an underlying claim. Plaintiff identified no evidence that the Defendants had conspired, before the shooting, to use excessive force against Mr. Reddie. And, under Michigan and federal law, there is no an independent claim or cause of action for evidence spoliation. Thus, Plaintiff's attempt to premise a civil conspiracy claim on either of those two theories was futile.

Now, Plaintiff has filed two more motions. On June 15, 2017, Plaintiff filed a motion for relief from the Court's January 17, 2017, opinion and order imposing sanctions on Defendants.

ECF No. 139. Plaintiff explains that Defendants recently disclosed that they have discovered the SD card which would have contained the audio recordings in question. Because Defendants have repeatedly indicated that they did not have the card, Plaintiff now argues that this new disclosure justifies additional sanctions. On June 21, 2017, Plaintiff filed a second motion for leave to file a third amended complaint. ECF No. 140. Plaintiff seeks to add a First Amendment claim for denial of access to courts. For the following reasons, the motion for leave to amend will be denied, and the motion for relief will be held in abeyance.

## I.

The allegations surrounding Mr. Reddie's death and the evidence spoliation were provided in the Court's January 17, 2017, Opinion and Order. ECF No. 118. Because the evidence of spoliation bears considerable relevance to the current motions, a portion of that summary will be reproduced here:

> Because Mr. Reddie is deceased, all allegations regarding what transpired in his apartment come solely from the testimony of the officers and care workers who were present at the time. On February 3, 2012, Defendants Somero and Klepadlo responded to reports of a potential domestic violence incident at Mr. Reddie's home. The officers found no evidence of domestic violence, but, after questioning Mr. Reddie and searching his apartment, the officers discovered that Mr. Reddie had been using marijuana in his home. Somero told Mr. Reddie that he would be reported for using marijuana in front of his minor child, despite Mr. Reddie's indication that his son was sleeping in another room at the time he smoked the marijuana. Naturally enough, Mr. Reddie was upset during his conversation with the officers. Klepadlo Dep. at 45, ECF No. 68, Ex. A. Based on that report, Child Protective Services visited Mr. Reddie, who admitted to smoking marijuana but refused to consent to removal of his son. Child Protective Services sought and obtained a court order to remove Mr. Reddie's son. Somero, Klepadlo, and two Child Protective Services care workers went to Mr. Reddie's apartment to effectuate the removal.

> Upon seeing the officers, Mr. Reddie immediately picked up his son and retreated into the apartment. He repeatedly told the officers he would not allow them to take his son. The officers and care workers followed Mr. Reddie into his apartment, where the situation quickly escalated. The officers testified that Mr. Reddie was five to ten feet away from them, separated by a coffee table. They

- 3 -

further testified that Mr. Reddie was playing loud music and they believed he was preparing himself to fight.

Defendant Klepadlo testified that he drew his Taser and pointed it at Mr. Reddie. Around the same time, the care workers removed Mr. Reddie's son from the apartment. Soon after Klepadlo drew his Taser, one of the care workers shouted that Mr. Reddie had a knife. In response, Klepadlo holstered his Taser and drew his handgun. The officers testified that they told Mr. Reddie to drop the knife, but he did not do so. Mr. Reddie then came out from behind the coffee table. The officers testify that they told Mr. Reddie they would shoot if he did not comply with their orders.

According to the officers, Mr. Reddie raised his hands to shoulder height and moved towards the officers (described as a "lunge"). Klepadlo fired at Mr. Reddie, who died instantly.

Jan. 17, 2017, Op. & Order at 2–3, ECF No. 118.

Testimony at the evidentiary hearing established that Defendants City of Grayling and

Officer Somero did not preserve any potential audio recording of the incident:

Somero testified that, on the day of the Reddie shooting, he activated his recording device prior to both visits with Mr. Reddie. Evid. Hearing Tr. I at 12, 34. Somero also testified that he believed the in-car video was working but not the audio. *Id.* at 15. After Mr. Reddie was fatally shot, Somero remained at the apartment. *Id.* at 36. Once additional officers arrived, Somero was assigned to guard the apartment door. *Id.* During the approximately forty-five minutes Somero was securing the scene, he did not return to his vehicle. *Id.* Eventually, Grayling Police Chief Baum told Somero to report to the Grayling Police Department and await questioning by the Michigan State Police (MSP). *Id.* Somero drove his vehicle, by himself, back to the department. *Id.* at 37. He testified that he followed normal procedures for handling the SD card: he removed the card from the system, gathered his other equipment, and set everything down on his office desk. *Id.* . . . Somero testified that he does not remember whether he handed the card to the Chief or simply referred to the presence of the card. *Id.* Regardless, Somero testified that he physically furnished the card to Chief Baum. *Id.* at 65. *See also* Somero Dep. at 157–59, ECF No. 85, Ex. B. According to Somero, he has not seen the SD card since that evening. Evid. Hearing Tr. I at 65. He further testified that he never talked to any other person about the SD card. *Id.* at 44–45.

Chief Baum's account of events is different. He testified that he does not have "memory of exactly how" the post-incident events occurred. *Id.* at 84. However, he did assert that "I did not make a copy of it because I did not have the knowledge to do that." *Id.* Chief Baum further stated that he did not know what happened to the SD card and that he did not have a memory of ever seeing it. *Id.* When asked if he ever handled it, Chief Baum said, "Not that I remember." *Id.*

When asked if he had ever represented that the SD card had been given directly to the MSP, Chief Baum denied any knowledge of making that representation. *Id.* at 84–85. At the evidentiary hearing, Chief Baum was asked whether the SD card should have been handled with a proper chain of custody. *Id.* at 89. He admitted that it should have been and that leaving the SD card lying on a desk would violate chain of custody principles. *Id.* He also admitted that, to the best of his recollection, the SD card was in Grayling Police Department custody when taken out of Somero's vehicle. *Id.* at 90.

Jan. 17, 2017, Op. & Order at 7–8.

The Michigan State Police (MSP) investigated the shooting but did not seize the SD card containing the original audio files or pursue the possibility that the files had been intentionally destroyed:

Detective Rick Sekely was the investigating MSP detective. *Id.* at 125. He testified that he received a compact disc which purportedly contained the recordings from Somero's car on March 1, 2012, twenty-seven days after the Reddie shooting occurred. *Id.* at 126. Detective Sekely was never given the SD card and never discussed the SD card during his investigation. *Id.* at 126–27. Detective Sekely requested a copy of the recordings from Chief Baum on the night of the shooting. *Id.* at 127. He testified that, when questioned about the recordings, both Chief Baum and Somero stated that there would be no audio, but that "we'll see if there's video." *Id.* at 128. Detective Sekely also testified that Chief Baum told him that the manufacturer helped the department download the SD card to the compact disc. Evid. Hearing Tr. II at 38. ProVision has no records of doing so and Defendants have not provided any other substantiation for this theory.

According to Detective Sekely, he asked for a copy of the recordings from Somero's vehicle during his initial investigation of the shooting. Evid. Hearing Tr. I at 127. Detective Sekely did not receive the recordings, in the form of a compact disc, until March 1, 2012. According to Detective Sekely, Chief Baum contacted him when the disc was available. *Id.* at 138. Detective Sekely traveled to the Grayling Police Department and picked up the compact disc along with some paper reports. *Id.* Detective Sekely is unsure if Chief Baum came out to greet him. *Id.* Several days later, Detective Sekely tried for the first time to play the files on the disc. *Id.* He was unable to get the files to play, despite trying several different computer programs. *Id.* at 139. Detective Sekely then emailed Chief Baum and asked if a special program was needed to view the files. *Id.* at 141. Chief Baum did not respond, and Detective Sekely never followed up. *Id.* The identity of the person who burned the compact disc remains unknown.

Jan. 17, 2017, Op. & Order at 9–10.

Forensic analysis of the disc provided to the MSP strongly suggested that a recording existed at one point, that a member of the Grayling Police Department listened to it, and that the individual then created the disc which was given to the MSP but did not transfer the actual audio recordings onto the disc:

> During the evidentiary hearing, witnesses testified about the operation of the ProVision system and interpreted the metadata found on the otherwise inoperable compact disc. Plaintiff's expert, Edward Primeau, has worked in the audio/video surveillance field for over thirty years. [Evid. Hearing Tr. III] at 62. In that time, he provided audio/video authentication and enhancement services, as well as evidence recovery services. *Id.* at 63. At the evidentiary hearing, Mr. Primeau explained that although the compact disc provided to the MSP did not contain any audio/visual files, it contained "metadata." *Id.* at 65. According to Mr. Primeau, metadata is "information about the file such as when it was created, the system it was created on, the date it was created, the size of the file." *Id.* at 66. This metadata can be found using special software programs. *Id.*

> The compact disc provided to the MSP contained fourteen ".xspf files." *Id.* at 69. These files act as a kind of directory or playlist: they point towards the location of the underlying audio/visual recordings. *Id.* These .xspf files are generated by the VLC Player software, a media player used by the Grayling Police Department. *Id.* at 71. According to Mr. Primeau, .xspf files are created through a multi-step process. First, an audio/visual file must be accessed on a computer. *Id.* at 72. Second, the file must be opened in the VLC Player. *Id.* Third, a playlist file had to be created via the VLC Player, named by the user, and then saved. *Id.* Mr. Primeau was able to recover metadata contained in the .xspf files which provided information about the underlying but now missing audio/visual recording files. *Id.* at 72. First, he explained that each of the 14 .xspf files were renamed by a user and contained "Reddie" in the filename. *Id.* at 72–73. He further testified that the metadata indicated that each recording was exactly five minutes long and that all fourteen recordings were created on February 3, 2012. *Id.* at 73. The metadata also revealed that the recordings were from GPD02. In summary, Mr. Primeau testified that the metadata showed that fourteen audio/visual recordings, which were each five minutes long, were made on February 3, 2012. *Id.* at 74. Those recordings were then opened in the VLC Player and fourteen playlist files were created. *Id.* Those playlist files, but not the actual audio/visual files, were then saved to the compact disc that was provided to the MSP. *Id.* When asked to confirm that the metadata proved that audio/visual recordings existed at some point in time, Mr. Primeau explained that VLC Player would not be able to make or save the playlist files unless there was an audio/visual file. *Id.* at 75–76. In order to have functionality, VLC Player must open an actual audio/visual file. *Id.* However, he admitted several times that there

was no way to know conclusively whether the recordings made in this instance contained both video and audio or only video. *Id.* at 116, 140.

Mr. Primeau further testified that, if a user was attempting to burn audio/visual recordings from an SD card to a disc, loading the files in VLC Player is both unnecessary and "clunky." *Id.* at 76. Instead, a user could simply insert the SD card into the computer, insert a blank disc, and directly copy the files from the SD card or computer to the disc. *Id.* When asked what the use of the VLC Player indicated to him, Mr. Primeau opined:

> It indicates to me that the operator of this process was very knowledgeable of taking data, putting it onto a computer and being able to open it and view it in a player, that wasn't the Pro-Vision player, and save it as a playlist file, and create a name for it to help organize all of the content.

*Id.* at 78.

Mr. Primeau also testified that Grayling Police Department officers sometimes utilized the simple two step approach rather than unnecessarily using the ProVision software. *Id.* at 85–86. During his search of the Grayling Police Department computer, Mr. Primeau found evidence that, on December 5, 2012, an individual logged into Officer Somero's account "created a video disk by dragging and dropping files from an SD card to his computer and then from the computer onto a compact disc." *Id.* at 86. As already mentioned, Mr. Primeau recovered 92 recording files from GPD01 when he searched the Grayling Police Department computer. *Id.* at 132. He testified that none of the files were .xspf files, meaning that the person who downloaded the files did not use the VLC Player to transfer the files. *Id.*

Mr. Primeau was asked why an individual would choose to use VLC Player to transfer recordings from an SD Card to a compact disc. *Id.* at 87. He explained that using VLC Player was "pretty much unnecessary," and that the only reasons he could think were "to rename the files" or "view the files." *Id.*

Detective Wesley Smith also testified at the evidentiary hearing. He confirmed that the metadata on the compact disc indicated that someone had to affirmatively name the underlying audio/visual files. *Id.* at 39. He also provided several possible reasons why the compact disc might include the .xspf pointer files but not the actual recording files: equipment failure, operator error, or intentional deletion. *Id.* 41–43. He admitted that the .xspf files indicated that audio/visual recording files had existed at some point, meaning that equipment failure was an unlikely explanation. *Id.* at 43. At least, the existence of the pointer files indicated that there was not a complete failure of the recording system. Detective Smith further testified that, after talking with two other MSP computer specialists, he concluded that user error was the most likely explanation for the

missing files. *Id.* at 51–52. When asked how he concluded that user error was the likely explanation, Detective Smith explained that, given the metadata on the disc, equipment failure was unlikely. *Id.* at 56. He further opined that intentional deletion was unlikely because there were better ways to destroy data than to create the .xspf pointer files. *Id.* at 58.

Jan. 17, 2017, Op. & Order at 13–16.

## II.

Federal Rule of Civil Procedure 15(a)(2) provides that a party may amend its pleading with the court's leave and that "the court should freely give leave when justice so requires." Denial of a motion to amend is appropriate, however, "'where there is 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.'" *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Attempts to add a party to an existing case are governed by Federal Rules of Civil Procedure 15, 20, and 21. After a responsive pleading has been served, "the standard for adding a party is the same regardless of the rule under which the motion is made: the decision lies within the discretion of the court." *Boyd v. D.C.*, 465 F. Supp. 2d 1, 2 n.3 (D.D.C. 2006) (citing *Wiggins v. Dist. Cablevision, Inc.*, 853 F.Supp. 484, 499 n.29 (D.D.C.1994)). *See also Oneida Indian Nation of N.Y. State v. Cty. of Oneida, N.Y.*, 199 F.R.D. 61, 73 (N.D.N.Y. 2000); 6 Fed. Prac. & Proc. Civ. §§ 1474, 1479 (3d ed.).

An amendment would be futile if the amended complaint does not state a claim upon which relief can be based. A pleading fails to state a claim under Rule 12(b)(6) if it does not contain allegations that support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009). In considering a Rule 12(b)(6) motion, the Court construes the

pleading in the non-movant's favor and accepts the allegations of facts therein as true. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The pleader need not provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In essence, the pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678-79 (quotations and citation omitted).

## A.

Plaintiff's proposed amended complaint seeks to add two Defendants, City of Grayling Police Chief Doug Baum and Crawford County Sheriff Kirk Wakefield, and three claims: violation of Plaintiff's First Amendment right of access to courts,  conspiracy under 42 U.S.C. § 1983 and conspiracy under state law. ECF No. 142, Ex. B.

The differences between Plaintiff's second amended complaint and proposed third amended complaint will be briefly summarized. *Compare* ECF No. 32 *with* ECF No. No. 142, Ex. B. Besides allegations regarding the shooting, the proposed amended complaint alleges that Klepadlo and Somero were both equipped with audio recording devices on the day of the shooting. Prop. Am. Compl. at 4. Plaintiff asserts that the shooting was recorded onto an SD card which was later downloaded onto a City of Grayling computer. *Id.* Eventually, a compact disc was created without the underlying audio files. Plaintiff alleges that "the individually-named Defendants destroyed the SD card and computer files" for the purpose of defeating subsequent investigations and lawsuits. *Id.* The proposed amended complaint further alleges that Klepadlo's

recording equipment saved a recording of the incident to a VHS tape system in his vehicle. According to Plaintiff, the "individually-named Defendants destroyed the VHS tape, VHS recording system, and police vehicle" to obstruct later investigations and lawsuits. *Id.* at 5.

Plaintiff's second proposed third amended complaint as includes the following allegation:

That the individually-named Defendants not only conspired to intentionally destroy wholly relevant evidence to the subject shooting but also conspired to make false representations to the Michigan State Police as to the operability of the recording systems and existence of the recorded evidence for the unlawful purpose of hindering, obstructing, and/or defeating the due course of justice including not only a homicide police investigation but also a subsequent civil § 1983 lawsuit.

*Id.*

The proposed third amended complaint frames a First Amendment claim for obstructing Plaintiff's access to the courts. *Id.* at 7. Plaintiff alleges that "Defendants' actions were obstructive when they destroyed relevant evidence" and that "substantial prejudice will inure to Plaintiffs that cannot be remedied if this matter proceeds solely on Plaintiffs' excessive force claims and the jury rules for Defendants." *Id.* at 8. The proposed third amended complaint also contains a conspiracy claim under § 1983 and a conspiracy claim under state law. The substance of the allegations regarding those claims is that each of the individually-named Defendants had an agreement to "destroy the audio recordings, recording operation systems, [and] police vehicles" and conspired "to make false representations of the unlawful actions to law enforcement personnel." *Id.* at 13.

## B.

Defendants argue that Plaintiff's proposed denial of access claim is futile and thus that the motion to amend should be denied. Defendants also contends that "Plaintiff's motion and brief fail to even discuss" the proposed conspiracy claims, and thus those claims are also futile.

Def. Resp. Br. at 1, ECF No. 145. However, the most reasonable reading of Plaintiff's proposed complaint is that that the conspiracy claims relate to the denial of access claim. In other words, Plaintiff is alleging a conspiracy among the Defendants to deprive her of her First Amendment right of access to courts.

To prevail on her conspiracy claims, Plaintiff must prove "an agreement between two or more persons to injure another by unlawful action." *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007). To adequately plead a conspiracy, the complaint must allege that "(1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed." *Id. See also Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). "Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985). Importantly, the pleading standard for conspiracy claims under § 1983 is "'relatively strict.'" *Gavitt v. Born*, 835 F.3d 623, 647 (6th Cir. 2016) (quoting *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 563 (6th Cir. 2011)). "Although circumstantial evidence may prove a conspiracy, '[i]t is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983.'" *Id.*

Under both federal and Michigan law, civil conspiracy claims are derivative. They are cognizable only insofar as there is an underlying cognizable legal claim. *See Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *In re Rospatch Sec. Litig.*, 760 F. Supp. 1239, 1265 (W.D. Mich. 1991) ("The focus of a civil conspiracy claim is the damage, not the conspiracy itself. Thus, conspiracy allegations not attached to allegations of a substantive wrong are not

actionable."). Plaintiff's proposed amended complaint adequately alleges that the Defendants conspired to destroy evidence and, by doing so, committed an overt act in furtherance of the conspiracy. Thus, the futility analysis will focus on the second element: whether the alleged conspiracy actually impacted Plaintiff's constitutional rights. Plaintiff's proposed conspiracy claims are non-futile only if Plaintiff's claim of substantive wrong, the denial of access claim, is actionable.

A constitutional right of access to courts exists for plaintiffs with nonfrivolous legal claims.[1] *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). Thus, like a civil conspiracy claim, a right of access claim is predicated upon another, nonfrivolous cause of action. "Denial of access to the courts claims may be 'forward-looking' or 'backward-looking.'" *Flagg v. City of Detroit*, 715 F.3d 165, 173 (6th Cir. 2013). "In backward-looking claims . . . , the government is accused of barring the courthouse door by concealing or destroying evidence so that the plaintiff is unable to ever obtain an adequate remedy on the underlying claim." *Id.* The Sixth Circuit has summarized the elements of a backward-looking denial of access claim as follows:

> (1) a non-frivolous underlying claim; (2) obstructive actions by state actors; (3) "substantial[ ] prejudice" to the underlying claim that cannot be remedied by the state court,; and (4) a request for relief which the plaintiff would have sought on the underlying claim and is now otherwise unattainable. Plaintiffs must make out the denial-of-access elements against each defendant in conformance with the requirements of § 1983.

*Id.* at 174 (quoting *Swekel v. City of River Rouge*, 119 F.3d 1259, 1264 (6th Cir. 1997)) (internal citations otherwise omitted).

In *Swekel*, the Sixth Circuit further distinguished between a denial of access claim where the alleged abuse "occurred pre- or post-filing." 119 F.3d at 1263.

---

[1] The constitutional right of access to courts has been premised on different constitutional provisions, including the Privileges and Immunities Clause, the First Amendment, the Fifth Amendment, and the Fourteenth Amendment. *See Cristopher*, 536 U.S. at 415 n. 12.

When the abuse transpires post-filing, the aggrieved party is already in court and that court usually can address the abuse, and thus, an access to courts claim typically will not be viable. If the abuse occurs pre-filing, then the plaintiff must establish that such abuse denied her "effective" and "meaningful" access to the courts. She can do this only by showing that the defendants' actions foreclosed her from filing suit in state court or rendered ineffective any state court remedy she previously may have had.

*Id.* at 1263–64 (internal citations omitted).

The evidence destruction here most likely occurred pre-filing. The recent revelation that the SD card still exists raises the possibility that certain spoliation occurred after filing (when the files on the SD card were written over). But, absent further information, the evidence spoliation likely occurred at the time the recordings on the SD card were accessed and renamed but not properly burned to the disc that was sent to the MSP. This case thus appears to involve pre-filing abuses.

Federal courts have consistently dismissed denial of access claims when any injury or prejudice the plaintiff might have suffered can be redressed by pursuing existing remedies. In *Joyce v. Mavromatis*, for example, the plaintiff "filed a § 1983 complaint alleging that the defendants, acting in concert, sought to defeat her state court damage suit by revoking a traffic citation issued to the son in Wintersville in connection with the accident and by altering the police report filed by the Wintersville police officer who investigated the accident." 783 F.2d 56, 56 (6th Cir. 1986). The Sixth Circuit dismissed the plaintiff's attempt to bring a "First Amendment access-to-the-courts claim." *Id.* In so holding, the Sixth Circuit reasoned as follows:

If she is able to prove that the Police Chief's son and his confederates undertook to destroy evidence of the son's negligence as a driver, there is no reason to believe that an Ohio court and jury would be unavailable and would not do justice between the parties. Rather than having denied access, the defendants have opened themselves to punitive damages and converted a small claims matter into a significant case, albeit not a federal case.

*Id.*

The Supreme Court has rejected denial of access claims in similar circumstances. In *Christopher v. Harbury*, the plaintiff alleged that "Government officials intentionally deceived her in concealing information that her husband, a foreign dissident, was being detained and tortured in his own country by military officers of his government, who were paid by the Central Intelligence Agency (CIA)." 536 U.S. 403, 405 (2002). The issue was whether that intentional deception gave rise to a cognizable claim for denial of access to the courts. The Supreme Court explained that, in a denial of access case, "the remedy sought must itself be identified to hedge against the risk that an access claim be tried all the way through, only to find that the court can award no remedy that the plaintiff could not have been awarded on a presently existing claim." *Id.* at 416. In *Christopher*, the Supreme Court noted that the plaintiff had advanced a number of tort claims, other than the denial of access claim, against the Defendants. Ultimately, the Supreme Court dismissed the plaintiff's denial of access claim:

> She has not explained, and it is not otherwise apparent, that she can get any relief on the access claim that she cannot obtain on her other tort claims, i.e., those that remain pending in the District Court. And it is just because the access claim cannot address any injury she has suffered in a way the presently surviving intentional-infliction claims cannot that Harbury is not entitled to maintain the access claim as a substitute, backward-looking action.

*Id. See also id.* at n. 22 (explaining that a denial of access claim might arise "where, for example, the underlying claim had been tried or settled for an inadequate amount given official deception, and thus likely barred by res judicata, or where the statute of limitations had run") (internal citations omitted); *Flagg v. City of Detroit*, 715 F.3d 165, 178 (6th Cir. 2013) (explaining that the plaintiffs had not shown substantial and irreparable prejudice to their wrongful death claim because, even if the obstruction had not occurred, plaintiffs would not have prevailed on the wrongful death claim).

Here, Plaintiff succeeded in filing suit and in bringing her excessive force claim to a trial-ready state. Plaintiff has thus not shown absolute denial from access to the courts. Accordingly, the issue is whether Defendants' evidence spoliation has so substantially and irreparably prejudiced Plaintiff as to deny her a meaningful and effective opportunity to prevail on her excessive force claim. For the reasons stated below, it did not.

Plaintiff asserts that the evidence spoliation has "frustrated and obstructed Plaintiff's First Amendment right to petition the judiciary for redress of grievance." Mot. File Third Am. Compl. at 11. But Plaintiff concedes that Plaintiff will be denied relief *only if* the jury concludes "that the testimony of the four government employees sufficiently rebuts the adverse inference and establishes that the contents of the recordings would not have favored Plaintiff." *Id.* Undoubtedly, the destruction of the audio recordings has eliminated evidence that would have potentially been extremely probative. But it has not been established that the recording equipment in question actually recorded intelligible audio, much less that the audio would have conclusively established that excessive force was used. And, further, the absence of the audio recording does not necessarily negate Plaintiff's excessive force claim: plaintiffs regularly succeed on excessive force claims without the benefit of audio/visual recordings of the incident.

But Plaintiff clearly suffered prejudice to her claim here. Given the circumstances surrounding the creation and destruction of the audio files, it is more than plausible that the recording would have aided Plaintiff's suit. And the Sixth Circuit has held that when police destroy evidence and delay an investigation, they substantially prejudice the plaintiff's ability to recover. *Swekel*, 119 F.3d at 1264. Thus, Plaintiff has suffered prejudice because of the spoliation.

However, Plaintiff has not shown that the prejudice to her claim cannot be remedied by this Court or that she is "unable to ever obtain an adequate remedy on the underlying claim." *Flagg*, 715 F.3d at 173. This is a fine distinction. A denial of access claim does not arise whenever government officials engage in egregious and potentially obstructive behavior. Rather, a plaintiff may bring a denial of access claim only when she has been denied meaningful and effective access to courts, not simply where her claim has been disadvantaged. Because much evidentiary misconduct can be remedied through traditional sanctions, not every instance of evidence destruction by government officials gives rise to an independent, constitutional claim.

Here, the Court has already imposed sanctions on Defendants for the spoliation. Plaintiff has repeatedly reiterated her belief that the sanctions were unfittingly mild. The Court has articulated the rationale underlying the choice of sanctions in previous orders. *See* Jan. 17, 2017, Op. & Order at 32–34; Feb. 8, 2017, Op. & Order at 3–4. In the January 17, 2017, Opinion and Order, the Court noted that entry of judgment for Plaintiff based on the spoliation was a plausible remedy, but explained that "the unlawfulness of the shooting has not been conclusively established" and "[g]iven the absence of other evidence of excessive force, summary judgment will not be entered for Plaintiff." *Id.* at 32–33.

Thus, the sanction applied—the rebuttable presumption that the destroyed recordings would have favored Plaintiff—was chosen because outstanding factual uncertainties remain. And it is unlikely that recovery of the recording would fundamentally change that fact. It is very possible that the recording was unintelligible and thus would not have provided any insight into what occurred in Mr. Reddie's apartment. It is also possible that the recording might have established that Mr. Reddie was behaving in a threatening manner. Perhaps most likely, the recording might have provided ambiguous evidence regarding the use of force. In each of those

situations, there would either be genuine issues of material fact for a jury to resolve or Defendants would be entitled to summary judgment. Even with the audio recording, then, Plaintiff would prevail only if she received a jury verdict. The evidence spoliation has thus prejudiced Plaintiff's case, but did not make success on the excessive force claim "unattainable." 119 F.3d at 1263–64.

The present situation is comparable to that in *Christopher*. The Government misconduct which occurred here has not prevented Plaintiff from litigating the underlying claim. The evidence spoliation might have disadvantaged Plaintiff's efforts to prevail on the excessive force claim. But *Christopher* suggests that, as long as the injury which gives rise to the purported denial of access claim can be redressed through surviving claims, the existence of some prejudice to the plaintiff does not render a denial of access claim cognizable. Rather, a denial of access claim can be brought only if the prejudice is so significant as to prevent effective redress by the court where the underlying claim was brought. In *Swekel*, the Sixth Circuit held that "the plaintiff must present evidence that the defendants' actions actually rendered any available state court remedy ineffective." 119 F.3d 1259. Here, the Court has already sought to remedy the evidence spoliation by imposing a rebuttable presumption that the destroyed recordings would have favored Plaintiff. Plaintiff argues that the rebuttable presumption is insufficient to allow her to receive effective redress, but has not adequately explained why that is so. Certainly, the jury might find for Defendants at trial, but the Plaintiff will still have received meaningful access to the court system. A denial of access claim is not cognizable where an alternative remedy is sufficient to ensure effective access. The sanction imposed here was adequate. As such, Plaintiff's proposed denial of access is futile and the motion to amend will be denied.

**III.**

Plaintiff has also filed a motion for relief wherein she essentially requests that the Court revisit its decision to impose sanctions in light of the revelation that the City of Grayling has had possession of the SD card all along. Plaintiff premises its motion for relief on Federal Rule of Civil Procedure 60(b), which provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding" in certain circumstances. The January 17, 2017, Opinion and Order where the Court sanctioned Defendants was not a final judgment or order. As such, Rule 60(b) does not apply. But, as Defendants concede, district courts "have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment." *Rodriguez v. Tennessee Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004). Generally speaking, reconsideration of interlocutory orders is warranted when "there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Id.*

Plaintiff brings the present motion because, on June 6, 2017, Defendants provided Second Amended Initial Disclosures which revealed that Officer Somero's SD card has been discovered. *See* Sec. Am. Discl. at 2, ECF No. 139, Ex. A. Defendants provided an accompanying explanation for the disclosure:

> Recently, we were informed by the City of Grayling that it had discovered what it believes to be the SD card used by Officer Alan Somero on February 3, 2012. This information was discovered during unrelated litigation where a document to which we were not privy was located. With this document, we are able to verify the specific SD card through its serial number. The City has reported that the audio/video files contained on the SD card, however, are not from the subject incident, but are from years after the subject incident. Defendants have not conducted a forensic analysis, and, as such, have no information regarding whether any useful information remains on the SD card. Defendants will make the SD memory card available for inspection at a Defense Counsel's office at a mutually convenient time and date.

*Id.* at n. 1.

Plaintiff argues that the revelation that the City of Grayling still has possession of the SD card demonstrates the falsity of the testimony of several members of the Grayling Police Department. Plaintiff contends that, because the January 17, 2017, Opinion and Order was thus premised on fraudulent information provided by Defendants, it should be revised. Defendants argue that Plaintiff's motion for relief is premature because it is currently unknown whether the recordings of the shooting can be recovered from the card.

Given the numerous uncertainties regarding the discovery of the SD card and whether any relevant files can be recovered from it, Plaintiff's motion for relief cannot be resolved at this time. It is undisputedly true that Plaintiff has sought the SD card in question since the initiation of the litigation and that the City of Grayling and its representatives have repeatedly asserted that the SD card's location was unknown. As reflected in the factual summary above, there was contradictory testimony regarding who took possession of the card after the shooting and whether (and when) it was provided to the MSP. Accordingly, the disclosure that the SD card in question has not only been in the City's possession the entire time, but has also been in use, is nothing short of surprising. The fact that Officer Somero was assigned the same card after returning to active duty also merits further investigation. It is unclear whether Defendants contend that the assignment was random, which would be a striking coincidence. If the assignment was not random, that strongly suggests that the Grayling Police Department not only knew where the SD card was, but also knew *whose* it was during the time in question.

Given the fact that the card was apparently used by Officer Somero upon his return to active duty after the shooting, it seems likely that the audio files have been overwritten. If that is the case, then the prejudice to Plaintiff has not fundamentally changed: because of Defendants'

recklessness (or worse) regarding the SD card, the audio files recorded at the time of the shooting have been lost. Thus, the discovery of the SD card is relevant primarily to the determination of the Grayling Police Department's level of culpability when it destroyed evidence. Additional investigation is necessary to determine whether additional sanctions should be imposed.

On the other hand, if the recordings made on the day of the shooting can be recovered from the SD card, then the order sanctioning Defendants might need to be revisited for different reasons. The evidentiary spoliation here was sanctionable precisely because it deprived Plaintiff of what might have been extremely probative evidence of what occurred in Mr. Reddie's apartment. If that evidence is available to Plaintiff after all, then Plaintiff has suffered little prejudice (apart from delay). If the recordings of the event in question exist, it would make little sense to impose a rebuttable presumption regarding the content of the recordings. Rather, the jury would be permitted to listen and draw its own conclusions.

In short, more information is needed to determine whether the discovery of the SD card necessitates revisions to the sanction imposed against Defendants. If further investigation reveals additional evidence of culpable, obstructive behavior by the Grayling Police Department, additional sanctions might be warranted. On the other hand, if forensic analysis recovers the recordings in question, then the existing sanction is superfluous. An evidentiary hearing will be scheduled. At the hearing, testimony should focus on whether forensic analysis of the SD card has occurred, what that analysis revealed, why the SD card was only identified recently, and why contradictory testimony regarding the location of the SD card was previously provided.

## V.

Accordingly, it is **ORDERED** that Plaintiff's second motion for leave to file a third amended complaint, ECF No. 140, is **DENIED.**

It is further **ORDERED** that an evidentiary hearing on Plaintiff's motion for relief, ECF No. 139, is **SCHEDULED** for **September 28, 2017 at 2:00 p.m.**

Dated: August 14, 2017                          s/Thomas L. Ludington
                                                THOMAS L. LUDINGTON
                                                United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 14, 2017.

                                    s/Kelly Winslow
                                    KELLY WINSLOW, Case Manager